T.C. Memo. 1999-43

UNITED STATES TAX COURT

ESTATE OF HELEN BOLTON JAMESON, DECEASED,
NORTHERN TRUST BANK OF TEXAS N.A., INDEPENDENT EXECUTOR,
Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2322-96.          Filed February 9, 1999.

S. Stacy Eastland, John W. Porter, and Margaret W. Brown, for petitioner.

Melanie R. Urban and Lillian D. Brigman, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, Judge: Respondent determined a deficiency in petitioner's Federal estate tax of $4,241,832. After concessions, the issues for decision are:

1.   Whether, at the time of her death, Helen Bolton Jameson (decedent) owned 80,485 shares of Johnco, Inc. (Johnco) common stock, as petitioner contends; 81,251 shares, as respondent

contends; or some other amount.  We hold that decedent owned 81,641 shares at the time of her death.

2.    Whether, for purposes of computing the taxable estate of decedent, the fair market value of the shares of Johnco common stock included in decedent's gross estate was $4,100,000 ($50.94 per share) as petitioner contends, at least $6,278,899 ($77 per share) as respondent contends, or some other amount.  We hold that the fair market value was $5,784,477 ($71 per share).

3.    Whether the method prescribed for the computation of the Federal estate tax transforms any part of such tax into a direct tax which has not been apportioned in accordance with the Constitution.  We hold that it does not.

Unless otherwise noted, all section references are to the Internal Revenue Code in effect on the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All amounts have been rounded to the nearest whole dollar.  Some of the facts have been stipulated and are incorporated herein by this reference.

FINDINGS OF FACT

I.    Decedent

Petitioner is the Estate of Helen Bolton Jameson, deceased (the Estate), who died testate on September 22, 1991.  Northern Trust Bank of Texas (Northern Trust) is the independent executor of the Estate.  Decedent was a resident of Texas at the time of her death.  Decedent was predeceased by her husband, John B.

Jameson, Jr. (John), who died on May 24, 1990, also as a resident of Texas. Decedent was survived by two children, Andrew B. Jameson (Andrew), born in 1949, and Dinah B. Jameson (Dinah), born in 1952.

At the time of her death, decedent owned that portion of the 82,865 shares of common stock in Johnco held by John at his death which had not been bequeathed by John to Andrew. The value and number of shares of stock included in decedent's estate is the basis of the present controversy.

## II. Johnco

Johnco was incorporated in Texas in 1968 by John. Upon Johnco's formation, John transferred to it the following: (1) A one-third interest in Jameson, Lord & Jameson (JLJ), a partnership owned by John and his two siblings; (2) an undivided one-third interest in 11,415 acres of timberland in Evangeline Parish, Louisiana; and (3) an undivided one-third interest in 5,090 acres of timberland in Rapides Parish, Louisiana. In 1986, JLJ was dissolved and the foregoing real property interests were divided among the partners. As a consequence, Johnco acquired 5,405 acres of timberland in Evangeline Parish, Louisiana (the Timber Property).

### A. The Timber Property

At the time of decedent's death, Johnco's principal asset was the Timber Property. Johnco also owned some unimproved land in Tanglewood, a residential section of Harris County, Texas, near Houston (Harris County Real Estate), as well as cash and

marketable securities.  As stipulated, the fair market value and tax basis of Johnco's assets as of September 22, 1991, were as follows:

| Asset | Fair market value | Tax basis |
|---|---|---|
| Cash | $25,000 | $25,000 |
| Investments | 492,000 | 492,000 |
| Building and equipment | 196,000 | 196,000 |
| Timber Property | 6,000,000 | 217,850 |
| Harris County Real Estate | 240,000 | 110,740 |
| Other | 19,000 | 19,000 |
| Subtotal | 6,972,000 | 1,060,590 |
| Liabilities | (14,000) | |
| Net Asset Value | 6,958,000 | |

The Timber Property was well managed and highly productive. Of the 5,405 acres, 5,097 acres were wooded with mature timber, primarily 27- to 33-year-old slash pine, but also bottomland hardwoods and loblolly pine.  An additional 108 acres of pine were premerchantable and ranged in age from 2 to 7 years in 1991. The remaining acres consisted of lakes and ponds, improvement sites, a road right-of-way, and a nontimberland area.  Based on soil type and quality, and its site index,[1] the Timber Property was considered to be extremely productive.

Because of the Timber Property's productivity, desirable location, and contiguous nature, decedent's Johnco stock would be

---

[1] Site index as defined by the U.S. Department of Agriculture is a designation of the quality of a forest site based on the height of the dominant stand at a designated age. Site index is essentially a measure of the productive capacity of a timberland site.

an attractive investment for a timber products company[2] or a pension fund. The Timber Property was a large, contiguous, privately owned timberland parcel, located within an extremely competitive timber market.[3] Large portions of timberland in the area were owned either by timber products companies for their own use or by the U.S. Forest Service. The U.S. Forest Service had provided a constant supply of timber products to the timber industry nationwide but had recently begun to reduce sales of timber from public lands in response to environmental concerns, which had the effect of increasing prices and demand for privately owned timber and timberland. Privately owned timberland is generally held in small parcels; the average-sized privately owned parcel is 80 acres.

The contiguous nature of the Timber Property offered a number of advantages in protecting and managing the timber that would appeal to a timber products company or pension fund buyer. In comparison to noncontiguous holdings, a contiguous parcel like the Timber Property had smaller borders and required less travel time to inspect the property, allowing greater control over the property, including the control of theft, wildfire, insects, and poachers. As a contiguous parcel, no portion of the Timber

---

[2] As used herein, "timber products company" refers to an operating company that is in the business of manufacturing lumber, paper, and other products made from timber. Johnco, in contrast, was a holding company and was not in the business of producing timber products.

[3] The Timber Property was within a 50-mile radius of several corporate sawmills, plywood plants, and pulp and paper mills.

Property was landlocked and dependent on private access rights;
the Timber Property had an internal road system and direct access
to public roads.

B.    Holding Company Status

In its 1990 and 1991 Forms 1120, U.S. Corporation Income Tax
Return, Johnco was designated a personal holding company,
consistent with the nature of Johnco's business.  Johnco had only
one employee, Andrew, who served as its president and chief
operating officer.  Over 80 percent of Johnco's gross revenue was
derived from the sale of timber.  Johnco harvested timber from
the Timber Property very conservatively.  The amount of timber
harvested annually was limited to an amount approximately equal
to, or less than, the Timber Property's annual growth.[4]  Johnco
did not actually cut the timber that was harvested or employ
personnel or own any of the equipment necessary to harvest
timber.  Potential buyers placed bids with Johnco to purchase
timber and were responsible for its cutting and transportation
off the Timber Property.  Although Andrew was the sole employee
of Johnco, management of the timber on the Timber Property was
generally handled by an outside consulting forester, who
monitored the property and advised Johnco regarding the specifics
of harvesting timber, for a commission based on timber sales.
Until late 1990, Johnco's outside consulting forester had been

---

[4] Limiting the annual harvest to annual growth is referred
to as "sustainable yield"; this method maintains an approximately
constant volume of timber in place.  Harvesting less than annual
growth results in an increase in timber volume on a given tract.

Harold Elliott.  Mr. Elliott first became acquainted with the Timber Property as a child--his father, a logging contractor, had managed a 15,000-acre tract of timberland owned by JLJ (the JLJ Property) that included the Timber Property.  After college, Mr. Elliott was employed by a forestry consulting firm that was managing the JLJ Property, and in 1964 he became the general manager and forester of the JLJ Property and continued to manage the Timber Property when it was transferred to Johnco after the dissolution of the partnership.

Mr. Elliott had considerable latitude in the management and harvesting of timber from the Timber Property during his tenure.  Subject to John's approval, Mr. Elliott would determine what timber to harvest, based upon his assessment of timber growth, growing conditions, and prevailing market prices.  Trees likely to be cut were those that would command the highest market prices[5] and trees in areas that required thinning to promote maximum timber growth.  Harvesting decisions were conservative, tilted towards future growth rather than current realization of income.

C.   Section 631(a) Election

On the valuation date, Johnco had made a valid election under section 631(a), pursuant to which it treated the cutting of

---

[5] As a tree matures, its value may increase not only because it contains a greater volume of wood, but because the tree's timber is suitable for a more valuable use.  Telephone poles, for example, require tall, straight trees; timber suitable for producing telephone poles commands a much higher price than immature or crooked trees used in the production of paper.

timber as a sale or exchange of property used in a trade or business.  On the valuation date, Johnco's section 631(a) election could be expected to apply to all subsequent taxable years.

D.   Liquidation Prospects

It was stipulated that no liquidation of Johnco was contemplated as of decedent's date of death or at the time of trial.

III. Johnco Stock Includable in Decedent's Estate

A.   Bequests by John B. Jameson, Jr.

At the time of his death, John owned 82,865 of the 83,000 issued and outstanding shares of Johnco as separate property; Andrew owned the remaining 135 shares.  In Article VI of his will, John made a specific bequest of his remaining available unified credit amount (computed as $299,850) to his two children, Andrew and Dinah (the unified credit bequest), as follows:

> I give, devise and bequeath to my two children, DINAH
> BOLTON JAMESON and ANDREW BOLTON JAMESON, in equal
> shares of ½ each, so much of my property, in cash or in
> kind, or partly in cash and partly in kind, as
> necessary to use the maximum unified estate tax credit
> as allowed under Federal Estate Tax Law as defined in
> 26 USCA 2010. * * *

Article VI further provided that Andrew's share of the unified credit bequest "shall be first satisfied out of the shares of JOHNCO, INC. common stock which I own, as such shares exist and are valued by independent appraisal as of my date of death." Under the will, John's residuary estate passed to decedent.  The residuary estate included all of the shares of Johnco common

stock that were not apportioned to Andrew under Article VI of John's will. Thus, at the time of her death, decedent's interest in Johnco stock consisted of the 82,865 shares held by John at his death, less however many shares were required to fund Andrew's share of the unified credit bequest.

Decedent was named the initial executrix of John's estate and served in that capacity until her death. As executrix, decedent timely filed an estate tax return Form 706, Estate (and Generation Skipping Transfer) Tax Return, for John's estate, reporting a value of $7,192,967 ($86.80 per share) for the Johnco stock passing through his estate. At the time of her death, decedent had not yet funded the unified credit bequest to Andrew and had not obtained an independent appraisal of the Johnco stock.

B. Number of Shares and Value Reported on Decedent's Form 706

Following decedent's death, in addition to serving as independent executor of the Estate, Northern Trust was appointed successor independent administrator of John's estate. In December 1992, at the request of Northern Trust, Clyde Buck of Rauscher Pierce Refsnes, Inc. (RPR), a Dallas, Texas, investment banking firm, performed two appraisals of Johnco stock: (1) The value of decedent's Johnco stock on her date of death (Decedent Appraisal); and (2) the value of the Johnco stock held by John on his date of death (John Appraisal). The record in this case contains the Decedent Appraisal but not the John Appraisal. The

Decedent Appraisal, however, makes express reference to the John Appraisal and its conclusions.

On December 21, 1992, Northern Trust filed decedent's estate's Form 706 and reported on Schedule B thereof that on her date of death decedent owned 79,730 shares of Johnco common stock (a 96-percent interest), after taking into account the unified credit bequest. The number of shares so reported was computed on the assumption that on John's date of death, the 82,865 shares held by him had a value of $3.7 million, or $44.65 per share. The $44.65 per share value was based upon the John Appraisal and was utilized notwithstanding the fact that John's date-of-death value for such stock was reported on John's Form 706 as $86.80 per share, or $7,192,967 for 82,865 shares. The Form 706 filed by John's estate has not been amended. The Estate further assumed, apparently based on additional information regarding John's lifetime gifts, that Andrew's share of the unified credit bequest was equal to $140,000, and funding this amount with Johnco stock at an assumed value of $44.65 per share would require 3,135 shares, leaving 79,730 shares in the Estate.

Relying on the Decedent Appraisal, the Estate reported the value of the 79,730 shares on decedent's date of death as $3.5 million ($43.90 per share). According to the Decedent Appraisal, Johnco had a liquidation value of $4.2 million, and 96 percent of Johnco's common stock, after reduction to reflect minority shareholder discounts (of approximately 13 percent), was worth $3.5 million on decedent's date of death.

For purposes of Schedule B of the Estate's Form 706, the liquidation value of Johnco was reported as follows:

| Asset | Fair market value | Tax basis | Built-in capital gains |
|---|---|---|---|
| Cash | $25,000 | $25,000 | -0- |
| Investments | 492,000 | 492,000 | -0- |
| Building and equipment | 196,000 | 196,000 | -0- |
| Timber Property and Harris Cnty. Real Estate | 5,239,000 | 329,000 | $4,910,000 |
| Other | 19,000 | 19,000 | -0- |
| Subtotal | 5,971,000 | 1,061,000 | 4,910,000 |
| Liabilities | (14,000) | --- | --- |
| Net asset value | 5,957,000 | --- | --- |
| Capital gains | (1,414,000) | --- | --- |
| Selling costs | (350,000) | --- | --- |
| **Liquidation value** | 4,193,000 | --- | --- |

## C.   Unified Credit Bequest

In December 1993, acting in its capacity as successor independent administrator of John's Estate, Northern Trust funded the unified credit bequest in John's will.  After taking into account all taxable gifts made to him by John during his lifetime and all other amounts passing to him which were includable in John's taxable estate, Northern Trust concluded that Andrew was entitled to receive a bequest of property equal in value to $111,617.49 as his share of the unified credit bequest, including a life insurance policy on Andrew's life valued at $5,366.  Thus, Northern Trust computed that $106,251 worth of Johnco stock was required to fund the balance of Andrew's share of the bequest (after taking into account the life insurance interest).  Using

the John Appraisal value of the Johnco stock on John's date of death of $44.65 per share, Northern Trust distributed 2,380 Johnco shares to Andrew to satisfy the $106,251 balance of his share of the unified credit bequest. In contrast, the Estate had reported on decedent's Form 706 her interest in Johnco stock under the assumption that $140,150 worth of Johnco stock, or 3,135 shares, would be necessary to fund Andrew's share of the unified credit bequest.

In funding the remaining $106,251 of the bequest with Johnco stock, Northern Trust disregarded the $86.80 per-share valuation that had been reported on the Form 706 filed by John's estate and instead used a valuation of $44.65 per share, resulting in the distribution of 2,380 Johnco shares to Andrew. If Northern Trust had funded Andrew's share of the unified credit bequest using the $86.80 per-share value, only 1,224 shares of Johnco stock would have been required to fund the $106,251 balance of the bequest, leaving 81,641 shares as part of the Estate.

IV. Decedent's Bequests of Johnco Stock

A. Testamentary Provisions

Under her Last Will and Testament (the Will), decedent made a bequest to Andrew and Dinah in equal shares of one-half each of such property "as necessary to use the maximum unified estate tax credit as allowed under * * * 26 USCA 2010". The terms of this bequest further provided that the bequest to Andrew "shall be first satisfied out of the shares of JOHNCO, INC. common stock

which I own, as such shares exist and are valued by independent appraisal as of my date of death."

A similar provision in the Will bequeathed the residuary of the Estate to Andrew and Dinah in equal shares of one-half each, with Andrew's share to be satisfied first out of the shares of Johnco, as valued by independent appraisal as of the date of decedent's death. Consequently, the amount passing to both Andrew and Dinah under the Will was dependent on the valuation of the Johnco stock held by decedent on her date of death.

B. Family Settlement

On December 23, 1993, before respondent had raised any question regarding the valuation of decedent's Johnco stock, Andrew and Dinah entered into a family settlement and release agreement[6] (family settlement agreement) whereby Andrew was allocated the remaining 80,485 shares[7] of decedent's Johnco stock at an agreed-upon date of death value of $4,025,000.[8] Dinah was

_____

[6] The Texas family settlement doctrine provides that parties to a will are free to decide among themselves how property should be distributed, and such settlements are given substantial deference under Texas law. See Shepherd v. Ledford, 926 S.W.2d 405 (Tex. App. 1996); In re Estate of Hodges, 725 S.W.2d 265 (Tex. App. 1986).

[7] Under the valuation assumptions employed by Northern Trust, 80,485 shares remained in the Estate after transferring 2,380 shares of Johnco stock to Andrew to fund his share of the unified credit bequest.

[8] As noted supra, in December 1992, approximately 1 year prior to the settlement, Northern Trust had hired RPR to value the Johnco shares for purposes of decedent's Form 706. In the Decedent Appraisal, RPR had appraised the liquidation value of Johnco at $4,200,000 as of decedent's date of death. The 80,485

(continued...)

allocated other assets of the estate, primarily marketable securities and cash, with a date of death value of $4,025,000. Under the terms of the agreement, Andrew and Dinah were each entitled to the income earned on the properties they would receive from the date of the settlement until the date of distribution. Although siblings, Andrew and Dinah were represented by separate counsel in the settlement. Inasmuch as Andrew and Dinah were motivated to ensure that they received everything they were entitled to under the Will, their interests were adverse, and they were acting at arm's length in entering into the family settlement agreement.

## ULTIMATE FINDINGS OF FACT

Under the terms of the unified credit bequest, 1,224 shares of Johnco stock were bequeathed to Andrew. Accordingly, 81,641 shares of Johnco stock are includable in decedent's gross estate.

On September 22, 1991, the fair market value of 81,641 issued and outstanding shares of Johnco (a 98-percent interest) was $5,784,477.

---

[8](...continued)
shares of Johnco remaining in the Estate after the funding of the unified credit bequest to Andrew represented approximately 97 percent of the outstanding shares of Johnco stock. Presumably RPR's December 1992 appraisal had an impact on the ultimate settlement amount of $4,025,000.

OPINION

I.   <u>Number of Shares</u>

The number of shares of Johnco stock includable in decedent's estate depends upon the number of such shares bequeathed to Andrew in the unified credit bequest of John's will, because as the beneficiary of the residuary of John's estate, decedent inherited whatever Johnco shares held by John at death were not specifically bequeathed to Andrew.  Petitioner took the position on the estate tax return that 79,730 shares were includable in decedent's estate.  Respondent determined in the notice of deficiency that the correct number is 80,485.  In the petition, petitioner did not assign error to this aspect of respondent's determination and now contends that 80,485 is the correct number.  Respondent, however, in his answer avers that the correct number is in dispute and contended at trial and on brief that the correct number is 81,251.[9]

---

[9] The parties address only obliquely what the consequences are for the allocation of the burden of proof occasioned by these modifications in position.  The only clue to petitioner's position is the following stipulation entered by the parties:

> Petitioner asserts * * * that respondent is bound by the following statement, at page 2, in the notice of deficiency, "Finally it is determined that the decedent owned 80,485 shares of Johnco, Inc. common stock.

For his part, respondent on brief expressly disavows a claim to any increase in the amount of the deficiency initially determined and seeks to minimize the significance of his change in position regarding the number of Johnco shares in decedent's estate. According to respondent, the determination in the notice that there were 80,485 shares in decedent's estate "constitutes nothing more than a position, subject to a shift based on more

(continued...)

The parties' disagreement turns upon the appropriate valuation of the Johnco shares for purposes of determining the amount of Johnco stock bequeathed to Andrew pursuant to the unified credit bequest in John's will. Respondent contends that the Johnco share value reported on the estate tax return for John's estate as John's date-of-death value--namely, $86.80 per share--must be used. Respondent thus calculates that 1,614 shares of Johnco stock were required to fund a unified credit bequest of $140,150[10] (1,614 shares x $86.80 = $140,095.20), leaving 81,251 in John's residuary estate inherited by decedent. In respondent's view, since decedent served as executor of John's estate and filed the return on which the $86.80 per-share value as of John's date of death was reported, and this return has not been amended, the $86.80 per-share value is an admission which should be used as evidence of such value.

_____

[9](...continued)
current information."

We believe that respondent's change from the position taken in the notice, after petitioner acceded to it in the petition, raises a "new matter" as that term is used in Rule 142, because the ascertainment of the <u>number</u> of Johnco shares in decedent's estate potentially requires different evidence, namely, of the value of the Johnco shares at John's date of death, as opposed to decedent's date of death. Accordingly, the burden of proof shifts to respondent to establish that the number of Johnco shares in decedent's estate exceeded 80,485. (Since respondent first signaled this change of position in his answer by averring that the number of Johnco shares in decedent's estate was "disputed", respondent was not required to seek leave to amend his answer in order to put the issue of the number of shares before us.)

[10] This figure was the amount reported on the estate tax return for John's estate as Andrew's unified credit bequest.

Petitioner contends that the Johnco share value on John's date of death as postulated in the John Appraisal performed by RPR in December 1992--namely, $44.65 per share--must be used for purposes of determining the number of shares received by Andrew pursuant to the unified credit bequest. Petitioner thus calculates that 2,380 shares of Johnco stock were required to fund a unified credit bequest of $106,251[11] (2,380 shares x $44.65 = $106,267[12]), leaving 80,485 shares in John's residuary estate inherited by decedent.[13] In petitioner's view, the $86.80 per-share value reported on John's estate's return as the value of the Johnco shares on John's date of death should not be used for purposes of determining the number of shares passing to Andrew pursuant to the unified credit bequest because the terms of John's will required that the bequest be funded with Johnco shares "as such shares * * * are valued by independent appraisal

---

[11] Although the returns for both John's and decedent's estates used the assumption that Andrew's unified credit bequest was equal to $140,150, petitioner contends that this amount was subsequently recomputed to be $106,251. Since the lower figure is adverse to petitioner's interests (because it has the effect of increasing the number of shares that passed to decedent's estate pursuant to the residuary clause of John's will), we accept it as established.

[12] There is a $16 discrepancy in petitioner's computations, but we consider it immaterial.

[13] The position taken by petitioner on the return for decedent's estate--that there were 79,730 (rather than 80,485) Johnco shares includable in the estate--was also premised on the $44.65 per-share appraised value of the Johnco shares. The difference results from the downward revision in the calculation of Andrew's unified credit bequest as equal to $106,251 rather than the original $140,150 assumed when the return was filed.

as of my date of death." In filing the return for John's estate in her capacity as executrix thereof, decedent did not obtain an independent appraisal of the Johnco stock passing through the estate. According to petitioner, since the $86.80 per-share value reported on the return was not the product of an independent appraisal, the terms of John's will preclude its use in determining the number of shares required to satisfy the unified credit bequest to Andrew. Instead, petitioner contends, the number of shares passing to Andrew must be determined on the basis of the December 1992 appraisal performed by RPR of the value of the Johnco shares as of John's date of death; namely, $44.65 per share. This appraisal was independent, having been commissioned by Northern Trust in its capacity as successor independent administrator of John's estate in order to comply with the terms of John's will in funding the unified credit bequest to Andrew.

The upshot of petitioner's position is that John's estate may report one value for the Johnco stock on the estate tax return while another, lower value for the stock may be used for purposes of funding a unified credit bequest made in John's will. For the reasons outlined below, we disagree and instead conclude that the valuation used on John's estate's return must also be used for purposes of funding the unified credit bequest.

Although the determination of the number of Johnco shares that passed to Andrew pursuant to the unified credit bequest and to decedent under the residuary clause of John's will turns upon

the value of the shares on John's date of death, the evidence in the record of such value is scant. The John Appraisal, which postulated the $44.65 per-share value on John's date of death contended for by petitioner, is not in the record. Its conclusions are in the record only because they are stated in the Decedent Appraisal. Moreover, the John Appraisal was performed by RPR, whose valuation methodologies are considered in some detail elsewhere in this opinion. Because we conclude infra that there are substantial flaws in the methodology employed by RPR to value the Johnco stock on decedent's date of death, which produced a significantly understated estimate of value, we likewise do not believe that RPR's valuation of the stock as of John's date of death is reliable. Accordingly, the evidence in the record strongly supports the conclusion that the $44.65 per-share value contended for by petitioner is too low.

More significantly, we do not believe that John, as testator, contemplated that the requirement in his will that the unified credit bequest be funded with Johnco shares "as * * * valued by independent appraisal" as of his date of death would result in the use of different date-of-death values for the Johnco stock--one for purposes of the estate tax return for John's estate and the other for purposes of funding the unified credit bequest. Such a construction of the will would put John's estate's marital deduction in jeopardy, because shares eligible for the section 2056 marital deduction on the basis of the valuation used on the return would--if a different, lower

valuation were used for funding the unified credit bequest--be shifted from the surviving spouse to the unified credit bequest beneficiary. For example, at the $86.80 per-share value reported on John's estate's return, it would take 1,224 Johnco shares to fund a $106,251 unified credit bequest, leaving 81,641 shares to the surviving spouse, eligible for the marital deduction. But if the unified credit bequest were later funded using a $44.65 per-share value, it would take 2,379 shares to do so, thereby shifting 1,155 shares (2,379 - 1,224 = 1,155) that were eligible for the marital deduction on the return as filed to the unified credit bequest beneficiary. Given that John's will clearly is drafted to maximize the benefit of the unified credit bequest and the marital deduction, we shall not ascribe to John an intent that would place the marital deduction in jeopardy. Accordingly, we interpret John's will as requiring that the same Johnco share value reported on the estate tax return for John's estate be used for purposes of funding the unified credit bequest. Based on that value ($86.80 per share) and a unified credit bequest equal to $106,251, the number of shares passing to Andrew pursuant to the unified credit bequest was 1,224 (1,224 shares x $86.80 = $106,243). As a result, the number of Johnco shares passing to decedent pursuant to the residuary clause of John's will, and includable in her estate, was 81,641, or 98 percent of the outstanding shares of Johnco.

II.  Fair Market Value

Valuation is a question of fact, and the trier of fact must weigh all relevant evidence to draw the appropriate inferences. Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part and remanding in part T.C. Memo. 1956-178; Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); Skripak v. Commissioner, 84 T.C. 285, 320 (1985).

Fair market value is defined for Federal estate and gift tax purposes as the price that a willing buyer would pay a willing seller, both having reasonable knowledge of all the relevant facts and neither being under compulsion to buy or to sell. United States v. Cartwright, 411 U.S. 546, 551 (1973) (citing sec. 20.2031-1(b), Estate Tax Regs.); see also Snyder v. Commissioner, 93 T.C. 529, 539 (1989); Estate of Hall v. Commissioner, 92 T.C. 312, 335 (1989).  The willing buyer and the willing seller are hypothetical persons, rather than specific individuals or entities, and the individual characteristics of these hypothetical persons are not necessarily the same as the individual characteristics of the actual seller or the actual buyer.  Estate of Curry v. United States, 706 F.2d 1424, 1428-1429, 1431 (7th Cir. 1983); Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981); Estate of Newhouse v. Commissioner, supra at 218; see also Estate of Watts v. Commissioner, 823 F.2d 483, 486 (11th Cir. 1987), affg. T.C.

Memo. 1985-595. The hypothetical willing buyer and willing seller are presumed to be dedicated to achieving the maximum economic advantage. Estate of Curry v. United States, supra at 1428; Estate of Newhouse v. Commissioner, supra at 218. This advantage must be achieved in the context of market and economic conditions at the valuation date. Estate of Newhouse v. Commissioner, supra at 218.

For Federal estate tax purposes, the fair market value of the subject property is generally determined as of the date of death of the decedent; ordinarily, no consideration is given to any unforeseeable future event that may have affected the value of the subject property on some later date. Sec. 20.2031-1(b), Estate Tax Regs.; see also Estate of Newhouse v. Commissioner, supra at 218; Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987).

Although the parties have stipulated the fair market value of Johnco's assets, they are not in agreement as to the value of decedent's Johnco stock. Petitioner contends that insofar as Johnco has a relatively low basis in highly appreciated assets (built-in capital gains), a share of stock in Johnco is worth less than a proportionate share of Johnco's assets, because such assets cannot be disposed of without the corporate level recognition of capital gains taxes. Moreover, petitioner contends that decedent's Johnco stock is less valuable because of the existence of a minority shareholder and because the shares lack marketability. Finally, petitioner asserts that the family

settlement agreement, as an arm's-length transaction, is the best indicator of fair market value.

A.    Expert Opinions

As is customary in valuation cases, the parties rely primarily on expert opinion evidence to support their contrary valuation positions.  We evaluate the opinions of experts in light of the demonstrated qualifications of each expert and all other evidence in the record.  Anderson v. Commissioner, supra; Parker v. Commissioner, 86 T.C. 547, 561 (1986).  We have broad discretion to evaluate "`the overall cogency of each expert's analysis.'"  Sammons v. Commissioner, 838 F.2d 330, 334 (9th Cir. 1988) (quoting Ebben v. Commissioner, 783 F.2d 906, 909 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1983-200), affg. in part and revg. in part on another ground T.C. Memo. 1986-318.  Expert testimony sometimes aids the Court in determining values, and sometimes it does not.  See, e.g., Estate of Halas v. Commissioner, 94 T.C. 570, 577 (1990); Laureys v. Commissioner, 92 T.C. 101, 129 (1989) (expert testimony is not useful when the expert is merely an advocate for the position argued by one of the parties).  We are not bound by the formulas and opinions proffered by an expert witness and will accept or reject expert testimony in the exercise of sound judgment. Helvering v. National Grocery Co., supra at 295; Anderson v. Commissioner, supra at 249; Estate of Newhouse v. Commissioner, supra at 217; Estate of Hall v. Commissioner, supra at 338. Where necessary, we may reach a determination of value based on

our own examination of the evidence in the record. Lukens v. Commissioner, 945 F.2d 92, 96 (5th Cir. 1991) (citing Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285); Ames v. Commissioner, T.C. Memo. 1990-87. Where experts offer divergent estimates of fair market value, we decide what weight to give these estimates by examining the factors they used in arriving at their conclusions. Casey v. Commissioner, 38 T.C. 357, 381 (1962). We have broad discretion in selecting valuation methods, Estate of O'Connell v. Commissioner, 640 F.2d 249, 251 (9th Cir. 1981), affg. on this issue and revg. in part T.C. Memo. 1978-191, and the weight to be given the facts in reaching our conclusion because "finding market value is, after all, something for judgment, experience, and reason", Colonial Fabrics, Inc. v. Commissioner, 202 F.2d 105, 107 (2d Cir. 1953), affg. a Memorandum Opinion of this Court dated January 22, 1951. Moreover, while we may accept the opinion of an expert in its entirety, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any part of such opinion, or reject the opinion in its entirety, Parker v. Commissioner, supra at 561. Finally, because valuation necessarily results in an approximation, the figure at which this Court arrives need not be one as to which there is specific testimony if it is within the range of values that may properly be arrived at from consideration of all the evidence. Silverman v. Commissioner, supra at 933; Alvary v. United States, 302 F.2d 790, 795 (2d Cir. 1962).

1.   Petitioner's Experts

At trial, petitioner relied on the reports of two experts, John H. Lax and Mr. Buck.  Mr. Lax, a principal in the Valuation Services Group of Arthur Andersen LLP (Andersen), has more than 25 years of experience in business valuation and holds the designations of certified management accountant and accredited senior appraiser from the Institute of Management Accounting and the American Society of Appraisers, respectively.  Mr. Buck is a managing director of RPR, holds an M.B.A. from Harvard Business School, and has more than 30 years of experience in corporate finance.

For purposes of their estimates, both of petitioner's experts assumed that they were valuing 80,485 shares, or 97 percent, of the outstanding stock of Johnco.

a.   John H. Lax

Mr. Lax used income and market approaches in valuing decedent's Johnco stock to show that Johnco was not viable as a going concern.  Starting with a hypothetical purchase price of $7 million,[14] he assumed that a prospective purchaser would leverage Johnco by financing 75 percent of the purchase price with a 10-percent, 10-year term loan.  Next, Mr. Lax forecasted income for the 10-year period in which the term loan would be outstanding if the timberland were managed for sustainable yield. He assumed that timber growth and inflation would be 4 percent

---

[14] Mr. Lax's report provides no basis or explanation for the choice of the $7 million purchase price.

annually. Based on his assumptions, Mr. Lax determined that Johnco's pretax income would be negative for all 10 years. Thus, he concluded that Johnco could not produce sufficient cash-flow to finance $5 million[15] of an assumed $7 million purchase price.

Next, Mr. Lax valued Johnco using a market approach in which he multiplied Johnco's earnings before interest and taxes (EBIT) by a multiple derived from a comparison to public companies (the EBIT method). For purposes of comparison, Mr. Lax selected two large, publicly traded, limited partnerships (the partnerships), which controlled 1,153,000 and 5,904,000 acres of timberland, respectively, of which approximately 70 percent was located in Georgia, Florida, and other parts of the South. Mr. Lax determined that the price/EBIT ratio of the partnerships was between 7.1 and 8.4, meaning that a partnership unit traded at 7.1 to 8.4 times its EBIT. When applied to Johnco's EBIT, these multiples suggested a range in value between $1 million and $1,150,000 before adjustment for lack of marketability. However, we are not persuaded that the two partnerships constitute useful comparables for Johnco, as they controlled timberland that was respectively 213 and 1,092 times larger than the Timber Property.

Mr. Lax also identified certain characteristics of Johnco that he thought detracted from its marketability: (1) History of low earnings and cash-flow; (2) concentration of asset value in

---

[15] We note that a $7 million purchase financed using 75 percent debt and 25 percent equity would imply $5.25 million in debt and $1.75 million in equity, not $5 million in debt as used by Mr. Lax in his report.

one category; (3) size of the company; (4) lack of professional management; and (5) C corporation status.  A 10-percent discount for lack of marketability to reflect these factors was apparently incorporated by Mr. Lax into his final determination of fair market value.

Mr. Lax determined that Johnco was a "negative cash flow producing C corporation holding company" whose assets could not support a $7 million purchase price.  He concluded that it was obvious that a willing buyer would buy decedent's Johnco stock only if Johnco's assets could quickly be sold for a fair return.

After analyzing publicly traded timber companies, Mr. Lax determined that those companies realized a return on equity (ROE) between 9 percent and 12 percent.  But unlike Johnco, Mr. Lax observed, those companies had professional management, geographically diverse assets, and the ability to borrow to cover short-term downturns.  By comparison, Johnco, Mr. Lax concluded, was "on the small end of being a viable timber company" and had very limited professional management and no geographical diversity.

Using the Capital Asset Pricing Model (CAPM) and the Arbitrage Pricing Theory (APT), Mr. Lax determined a cost of equity (COE) for the large publicly traded timber companies of 12.67 percent.  Due to the limiting characteristics of Johnco, Mr. Lax concluded that a buyer of decedent's Johnco stock would demand a premium of a 5-percent to 10-percent greater return, so that an annual pretax ROE of 17 percent to 22 percent would be

required.  Concluding that Johnco could not provide such a return, Mr. Lax assumed that a willing buyer would liquidate Johnco over 1 year for the following amounts:

| | |
|---|---|
| Amount realized | [1]$6,000,000 |
| Less 34% tax on built-in capital gains | [2](1,870,000) |
| Net liquidation value | 4,130,000 |

[1] Mr. Lax's report provides no basis or explanation for this figure.  Insofar as the report details Johnco's assets, it does not provide a value for the Timber Property and omits the Harris County Real Estate.

[2] This equation apparently ignores Johnco's basis in its assets of $1,060,590, which if taken into account, would lower estimated capital gains taxes, resulting in a higher valuation.

Based upon the foregoing, Mr. Lax determined the fair market value of decedent's 97-percent share of the outstanding Johnco stock to be $4 million.[16]

b.  G. Clyde Buck

Under the assumption that prospective buyers would seek to maximize their economic return, Mr. Buck first identified three possible strategies for realizing income from Johnco's assets: (A) Sell all of the timber, then sell the residual land, over a period of 24 months; (B) sell the timberland intact; or (C) operate the timberland as a going concern, cutting on a sustainable yield basis.  Using present value concepts, Mr. Buck valued each of the three possible strategies on an after-tax

[16] 97 percent of $4,130,000 = $4,006,100.

basis,[17] determining their present values to be as follows (millions):

| Discount Rate | 20% | 25% | 30% |
|---------------|-----|-----|-----|
| Case A | $3.9 | $3.8 | $3.6 |
| Case B | 4.6 | 4.6 | 4.6 |
| Case C | 0.9 | 0.7 | 0.6 |

Like Mr. Lax, Mr. Buck determined that the highest present value would be realized through a liquidation, insofar as the prospective buyer would receive a large cash inflow within a relatively short time. Although a quick sale of the Timber Property might result in a lower sale price, Mr. Buck concluded that because of the high discount rates that would be demanded by an investor, the present value of that strategy would be the highest. Mr. Buck dismissed the option of operating Johnco as a going concern, because "the economic benefits are not worth the delay in getting cash".

Mr. Buck testified that a hypothetical willing purchaser of a controlling interest in a small company like Johnco would expect a return on investment of at least 20 to 25 percent, and perhaps as much as 30 to 35 percent. According to Mr. Buck, an investor in a private company expects a higher rate of return than an investor in a public company[18] because of a lack of investment liquidity, the uncertainty of the underlying asset

---

[17]  Mr. Buck's approach incorporated the effect of built-in capital gains into the determination of fair market value by calculating present value on an after-tax basis.

[18] Mr. Buck assumed that historical returns of publicly traded securities were in the range of 10 to 15 percent.

values, and the uncertainty of the timing of future cash-flows.
In analyzing expected return, Mr. Buck testified that a
hypothetical buyer would consider Johnco's historical earnings
and cash-flows, income taxes, and liquidity.

Mr. Buck also considered Johnco's liquidation value based
upon the stipulated net asset values, taking into account the
effect of the built-in capital gains. Assuming a 31-percent
capital gains rate, Mr. Buck calculated the net liquidation of
Johnco as follows:

| | |
|---|---|
| Net asset value | $6,958,000 |
| Less: Estimated capital gains taxes | (1,698,000) |
| Less: Estimated selling costs | (420,000) |
| Net liquidation value | 4,840,000 |

While acknowledging that a hypothetical buyer would consider the
liquidation value of Johnco's assets to be the primary factor,
Mr. Buck testified that such a buyer would also consider Johnco's
operating results as an indicator of its going concern value.
Based upon past operating results, Mr. Buck concluded that going
concern value would not be of interest to a prospective buyer
because a greater amount could be realized through liquidation,
unless it could be determined that past operations had been
"intentionally depressed" to produce below-normal profits. Mr.
Buck noted that a buyer of decedent's Johnco stock would in
theory have the ability to replace Johnco's existing management
and alter Johnco's operating strategy. According to Mr. Buck,
the potential need to make such changes would create concerns and

additional considerations for a hypothetical buyer, however, including:

> (i) the potential need to buy out the 3% minority shareholder, (ii) the need to terminate existing Johnco management, (iii) the need to identify and retain outside assistance to manage and, if appropriate, liquidate Johnco's assets and (iv) the risk of costly litigation with Johnco's minority shareholder.

Mr. Buck determined that the foregoing considerations and risks could result in a 10-percent discount from the price a willing buyer would pay if there were no minority shareholder considerations.[19] (We shall hereinafter refer to this discount to reflect the presence of a 3- to 4-percent minority shareholder as a nuisance discount.) Accordingly, Mr. Buck determined that the fair market value of decedent's Johnco stock was $4.2 million.[20]

---

[19] Because Mr. Buck assumed that decedent held 80,485 shares, or 97 percent, of the outstanding stock of Johnco on her date of death, the remaining shares held by Andrew made him a 3-percent shareholder under this assumption.

[20] This figure reflects an average of the values calculated by Mr. Buck under case B with a 10-percent discount, under Case B without a discount, and under case A without a discount, calculated as follows:

Case B with discount
    0.97(0.90 x $4,600,000) = $4,000,000

Case B without discount
    0.97($4,600,000) = $4,462,000

Case A without discount
    0.97($3,800,000) = $3,700,000

Average = $4,200,000

2.   Respondent's Expert:  Francis X. Burns

Respondent relies on the expert report of Francis X. Burns, a principal of IPC Group, LLC (IPC), a Chicago-based consulting firm.  Mr. Burns, who holds a master of management degree in finance and economics from Northwestern University's Kellogg School of Management, valued Johnco based on the fair market value of its assets.  Mr. Burns' use of an asset approach is supported by Rev. Rul. 59-60,[21] 1959-1 C.B. 237, 243, which states:

> The value of the stock of a closely held investment or real estate holding company * * * is closely related to the value of the assets underlying the stock.  For companies of this type the appraiser should determine the fair market values of the assets of the company. * * *

In support of his choice, Mr. Burns noted that Johnco:  (1) Was classified as a personal holding company on its 1990 and 1991 returns; (2) had only one employee; and (3) produced no goods or services other than the contracted sale of a percentage of timber growth each year.  He also found it significant that petitioner and respondent had stipulated the fair market value of Johnco's assets.  Because the fair market value of the assets was stipulated, Mr. Burns' report focused on evaluating the merits of petitioner's position regarding the valuation discounts it sought.

---

[21] Rev. Rul. 59-60, 1959-1 C.B. 237, outlines factors to be considered in valuing the stock of closely held corporations and "has been widely accepted as setting forth the appropriate criteria to consider in determining fair market value".  Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990).

### a.   Nuisance Discount

Mr. Burns was critical of the nuisance discount sought by petitioner.  Traditionally, he noted, the potential actions of a 4-percent minority shareholder[22] do not warrant any discount from fair market value, but in practice, controlling interests are often given a control premium for the power that they wield over minority shareholders.  According to Mr. Burns, the buyer of a 96-percent interest in Johnco would possess ultimate control over the company's operations, while the possibility of the minority shareholder's causing problems for the new owner of the majority interest was mere speculation.

### b.   Marketability Discount

Mr. Burns also disagreed with the views of petitioner's experts concerning a discount for lack of marketability.  According to Mr. Burns, lack of marketability is a relative concept; there is not one standard of marketability to which all assets can be compared.  Instead, assets must be compared to their relevant market.  While petitioner and its experts focused on the marketability of Johnco stock in the market for the stock of closely held corporations, Mr. Burns determined the timber market to be the relevant market for assessing marketability,

---

[22] Mr. Burns assumed Andrew was a 4-percent shareholder on the valuation date based upon the number of Johnco shares reported as owned by decedent on her Form 706; namely, 79,730 shares, or 96 percent, of the outstanding shares of Johnco.

because a 96-percent interest in Johnco represented control over substantial timber assets.

In evaluating the marketability of Johnco's timber assets, Mr. Burns determined that both the quality of the Timber Property and conditions in the timber market were important.  The primary source of information for Mr. Burns' analysis was the Engineering and Valuation report of Robert Baker, who also testified at trial.  Mr. Baker is an experienced forester employed as an engineering revenue agent for respondent in his Shreveport, Louisiana, office.  His expertise and familiarity with timber in central Louisiana were apparent in his report and testimony.  In his report, Mr. Baker concluded that the Timber Property was an above-average property for several reasons:  (1) It was a unique, highly desirable tract due to its size, contiguous nature, and past prudent management; (2) it was located within a very competitive timber products market; and (3) it was being valued at a time when the market for timber properties was viable and active.  Mr. Burns noted that the stipulated value of the Timber Property was based on the market prices paid for similar properties and concluded that because petitioner had not presented any evidence that the Timber Property would be more difficult to sell than comparable tracts, the appraised fair market value of the Timber Property was a realistic and realizable amount.  While concluding that at least 94 percent of Johnco's assets were marketable, Mr. Burns acknowledged the possibility that a willing buyer interested primarily in the

Timber Property might seek a discount for the less certain marketability of Johnco's miscellaneous assets, which included a building, equipment, and a vacant lot and constituted the remaining 6 percent of Johnco's total net asset value. Accordingly, Mr. Burns determined that 6 percent should be the ceiling on any discount for lack of marketability.

      c.   <u>Built-In Capital Gains Discount</u>

Mr. Burns opposed the application of a built-in capital gains discount, as such a discount emphasized net proceeds, rather than fair market value, to a willing buyer. Such an emphasis, he thought, "is founded on a counter-intuitive premise; that is, a hypothetical and instantaneous sale of the same assets which the willing buyer has just purchased." Accordingly, he considered both the prospect of liquidation and the recognition of built-in capital gains to be speculative. Mr. Burns noted that respondent's forester, Mr. Baker, Johnco's former forester, Mr. Elliott, and even a forester hired by petitioner, Mr. Screpetis,[23] had all concluded that the best use of the Timber Property was as commercial timberland and that a timber products company or a pension fund was the most likely purchaser. In testimony, petitioner's expert Mr. Lax also conceded that the most likely purchaser was a timber products company or a pension fund. Thus, Mr. Burns concluded, insofar as a timber products

---

[23] Mr. Screpetis was a consultant forester employed by George Doyle, Inc., which had been hired by Mr. Buck to appraise the Timber Property in connection with his valuation of Johnco.

company that acquired Johnco would be likely to continue harvesting timber, a sale of the assets might never take place, and taxation of the built-in capital gains could be postponed indefinitely.

Even if Johnco were to be liquidated, Mr. Burns thought it would be possible to avoid recognition of the built-in capital gains using a number of "tax strategies", such as: (1) Accepting debt obligations payable over future years and electing the installment method; (2) exchanging the property in a like-kind exchange; and (3) electing S corporation treatment and holding the assets for at least 10 years.

### d. Selling Costs

Mr. Burns also rejected applying a discount to reflect future selling costs. He noted that selling costs are part of any transaction and would be reflected in the selling prices of comparable properties used to value the Timber Property. Moreover, Mr. Burns thought it inappropriate to discount the fair market value of decedent's Johnco stock for selling costs that were only hypothetical, insofar as they would not be incurred unless and until the new purchaser sold the Timber Property.

## B. Fair Market Value of Johnco

### 1. Built-In Capital Gains

On several occasions, we have held that, in valuing stock in a closely held corporation using the net asset value method, a discount to reflect potential capital gains tax liabilities at the corporate level was unwarranted where there was no evidence

that a liquidation was planned or that it could not have been accomplished without incurring a capital gains tax at the corporate level. Ward v. Commissioner, 87 T.C. 78, 103-104 (1986); Estate of Andrews v. Commissioner, 79 T.C. 938 (1982); Estate of Piper v. Commissioner, 72 T.C. 1062 (1979); Estate of Cruikshank v. Commissioner, 9 T.C. 162 (1947). Our denial in the past of a built-in capital gains discount was based in part on the notion that valuation discounts for estate and gift tax purposes are not appropriate where based on an event that may not transpire. See, e.g., Ward v. Commissioner, supra at 103-104 (selling costs and taxes recognized not taken into account when liquidation only speculative); Estate of Piper v. Commissioner, supra at 1087 (no discount for built-in capital gains where no evidence liquidation was planned, or could not have been accomplished without corporate level recognition of capital gains); Estate of Cruikshank v. Commissioner, supra at 165 (tax on appreciation only hypothetical where no demonstrated intent to liquidate, and liquidation could occur without corporate level tax).

Prior to the repeal of the doctrine established in General Utils. & Operating Co. v. Helvering, 296 U.S. 200 (1935) (the General Utilities doctrine), the recognition of corporate level capital gains taxes could also be speculative because the General Utilities doctrine, as codified in former sections 336 and 337, allowed the tax-free liquidation of a corporation and thus the complete avoidance of corporate level capital gains. Thus, even

where it could be established that a liquidation was planned, the General Utilities doctrine still made it possible to avoid corporate level taxes, causing any projected tax liability from built-in capital gains to be purely speculative and not warranting consideration in determining fair market value. See, e.g., Estate of Piper v. Commissioner, supra at 1087; Gallun v. Commissioner, T.C. Memo. 1974-284.

Recently, in Estate of Davis v. Commissioner, 110 T.C. 530 (1998), we held that in determining the fair market value of stock in a closely held corporation after the repeal of the General Utilities doctrine, consideration of the effect of built-in capital gains is not precluded as a matter of law and is appropriate in some circumstances. In Estate of Davis, we were convinced on the record that even though no liquidation or asset sale was planned, a hypothetical willing buyer and seller would not have disregarded the existence of built-in capital gains in agreeing on a purchase price. In that case, both the taxpayer's and the Commissioner's experts had recommended taking into account built-in capital gains in determining fair market value. Even before the repeal of the General Utilities doctrine, courts had on occasion considered built-in capital gains. See, e.g., Obermer v. United States, 238 F. Supp. 29, 34-36 (D. Haw. 1964) (finding expert testimony showed built-in capital gains tax would necessarily adversely affect value of stock at issue to willing buyer); Clark v. United States, 36 AFTR 2d 75-6417, 75-1 USTC par. 13,076 (E.D. N.C. 1975) (well-informed willing buyer of

stock in corporation would consider that underlying assets of corporation included inactive investment portfolio that, upon liquidation, would incur substantial capital gains tax liability).

Petitioner's position is that a prospective buyer of decedent's Johnco stock would value the stock with the intention of liquidating Johnco. Thus, in petitioner's view, a prospective liability for built-in capital gains is not speculative, and a built-in capital gains discount is warranted. Petitioner's experts have attempted to support this conclusion by comparing the net present value of Johnco as a going concern to its net present value if liquidated. We think it is clear that petitioner's experts were able to reach this result only because they incorrectly valued decedent's Johnco stock on the basis of Johnco's income, rather than its assets. We agree with Mr. Burns that decedent's Johnco stock is properly valued under Rev. Rul. 59-60, 1959-1 C.B. 237, by looking to the fair market value of Johnco's assets. That method is most reasonable in a case like this one, where the corporation functions as a holding, rather than an operating, company and earnings are relatively low in comparison to the fair market value of the underlying assets. See Estate of Davis v. Commissioner, supra; Estate of Piper v. Commissioner, supra at 1069-1070; Estate of Cruikshank v. Commissioner, supra. Contrary to petitioner's position, we agree with respondent that in light of the many desirable characteristics of the Timber Property the most likely buyer of

decedent's Johnco stock would be a large timber products company or pension fund.

While it may still be possible after the repeal of the General Utilities doctrine to avoid recognition of built-in capital gains, respondent has failed to convince us that any viable options for avoidance would exist for a hypothetical buyer of decedent's Johnco stock. The tax strategies suggested by Mr. Burns, who is not an expert in taxation, can at best defer the recognition of built-in capital gains, but only by deferring income and ultimately cash-flow, and suggest the work of an advocate rather than a disinterested expert witness.[24] Perhaps anticipating that the avoidance strategies offered by his expert do not withstand scrutiny, respondent argues on brief that petitioner could "hire some creative and resourceful tax practitioner" and since "someone might think of a way to avoid the tax effect of an immediate liquidation", the tax on built-in capital gains is only speculative. Contrary to respondent, we do not think Mr. Burns has demonstrated any real possibilities for avoidance of the built-in capital gains tax by Johnco, let alone

[24] We note also that in suggesting the availability of an S corporation election as a means of avoiding the tax on built-in capital gains, respondent and his expert overlook clear obstacles to that approach. Electing S corporation status would require the consent of all shareholders; thus Andrew could thwart that approach. Also, the shareholders of an S corporation must generally be individuals, whereas experts of both parties conclude that the likely buyer of decedent's Johnco stock would be a large timber products company or a pension fund. Finally, respondent and his expert fail to consider the impact that sec. 1374 might have on any decision to convert Johnco from C to S corporation status.

done so in a manner sufficient to prevent petitioner from being able to carry its burden of final persuasion, as respondent asserts.

We may allow the application of a built-in capital gains discount if we believe that a hypothetical buyer would have taken into account the tax consequences of built-in capital gains when arriving at the amount he would be willing to pay for decedent's Johnco stock. Because Johnco's timber assets are the principal source of the built-in capital gains and, as discussed infra, are subject to special tax rules that make certain the recognition of the built-in capital gains over time, we think it is clear that a hypothetical buyer would take into account some measure of Johnco's built-in capital gains in valuing decedent's Johnco stock.

On the valuation date, Johnco had a valid election under section 631(a) that could not be revoked absent a showing of undue hardship. Section 631(a) treats the cutting of timber as though it were a hypothetical sale or exchange of the timber. This fictitious sale is deemed to have been consummated at the time when the cutting occurs, and the timber must be cut for sale or use in the taxpayer's trade or business. The sale price in this hypothetical sale is the fair market value of the timber on the first day of the taxable year in which it is cut. Gain or loss under section 631(a) is measured by the difference between the fair market value of the cut timber and its adjusted basis

for depletion,[25] and is characterized as a sale or exchange under section 1231.  The fair market value of the cut timber then becomes the new basis of the timber (new basis) for all purposes in the hands of the taxpayer.  If the cut timber is then sold, ordinary gain or loss is calculated as the difference between the amount realized and the new basis.

As a result of its section 631(a) election, Johnco will recognize its built-in capital gains under section 1231 as it cuts timber.  This recognition will occur independently of any liquidation.  Consequently, we conclude that a hypothetical willing buyer of decedent's Johnco stock would take into account Johnco's built-in capital gains, even if his plans were to hold the assets and cut the timber on a sustainable yield basis.  For this reason, we hold that a valuation of decedent's Johnco stock should take into account Johnco's built-in capital gains, but only in an amount reflecting the rate at which they will be recognized, measured as the net present value of the built-in capital gains tax liability that will be incurred over time as timber is cut.

We calculate the net present value of the built-in capital gains tax liability by estimating Johnco's capital gains

---

[25] Where only a portion of the timber is cut, basis is allocated to cut and standing timber in proportion to timber units.  See sec. 612; sec. 1.612-1, Income Tax Regs.  Units of timber are ordinarily expressed in terms such as thousands of board feet, log scale or cords, as appropriate.  Timber quantity is generally estimated upon acquisition and subsequently increased as timber is acquired and decreased as units of timber are cut and sold.

recognition for future years, calculating capital gains taxes that will then be owed, and discounting those future tax liabilities to their present value. The results of our calculations are dependent on four independent variables: (1) The rate at which Johnco's timber grows; (2) the effects of inflation; (3) capital gains tax rates; and (4) the discount rate employed. Each of the variables chosen for our calculations was within the range of figures offered by the parties' experts. Based on the testimony we received from Messrs. Elliott and Baker, we think that a prospective purchaser of Johnco would manage the Timber Property for sustainable yield by cutting an amount of timber each year equivalent to that year's timber growth. Mr. Elliot, who has had many years of involvement with the Timber Property, testified that historically, the Timber Property had produced annual growth of 8 to 10 percent. Accordingly, for purposes of our calculations, we assume annual timber growth to be 10 percent. In our calculations, we also assume a 4-percent rate of inflation, based upon the 3- to 5-percent, and 4-percent, estimates of Messrs. Buck and Lax, respectively. As in effect on the valuation date, we assume a 34-percent capital gains tax rate under section 1201. Finally, in selecting a discount rate for our equations, we assume a rate of 20 percent and note that this in between the 17 to 22 percent suggested by Mr. Lax and the 20 to 25 percent suggested by Mr. Buck.

Based on the foregoing, we have calculated Johnco's estimated future built-in capital gains recognition necessary to fully recognize the built-in capital gains present on the valuation date. Using the above assumptions in our calculations, as indicated in the appendix, approximately 9 years of timber sales on a sustainable yield basis would be required to recognize fully the built-in capital gains present on the valuation date. To simplify our calculations, for each year's cutting, we have assumed that timber prices on the cutting date equaled the fair market value on the first day of the taxable year, so that no ordinary gains or losses result. As shown in the appendix, we have calculated the expected cash outflows for each of those 9 years attributable to tax liability from the built-in capital gains in existence on the valuation date. Discounting those expected cash outflows back to the present using a 20-percent rate, we find the net present value of the future built-in capital gains tax liability to be ($872,920) and allow a reduction of $855,462[26] in determining the fair market value of decedent's Johnco stock.[27]

---

[26] Decedent's Johnco shares constituted 98 percent of the company's outstanding stock, and 98 percent of $872,920 is $855,462.

[27] The parties have not addressed the applicability of a built-in capital gains discount with respect to the Harris County Real Estate, which had a fair market value and basis of $240,000 and $111,740, respectively, on the valuation date. We accordingly decline to do so.

2.  Marketability Discount

Where appropriate, this Court has on numerous occasions applied a discount for lack of marketability in valuing shares of stock in a closely held company.  See, e.g., Estate of Jung v. Commissioner, 101 T.C. 412 (1993); Estate of Furman v. Commissioner, T.C. Memo. 1998-157; Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. without published opinion 91 F.3d 124 (3d Cir. 1996); Estate of Lauder v. Commissioner, T.C. Memo. 1992-736.  On brief, petitioner argues that it is entitled to a 10-percent discount for lack of marketability.  Neither report of petitioner's two experts addresses a marketability discount directly.  Mr. Buck's report does contend that the existence of a 3-percent minority shareholder would cause a 10-percent discount from the price that a willing buyer would otherwise pay for a 97-percent interest in Johnco.  Mr. Buck does not characterize such a discount as one for marketability, and we agree.  We characterize such a discount as a nuisance discount and address it separately, infra.

Only respondent's expert report addresses marketability directly.  Although often closely related, "marketability" and "liquidity" are not interchangeable terms.  As respondent's expert argued, liquidity is a measure of the time required to convert an asset into cash and may be influenced by marketability.  Marketability, on the other hand, is not a temporal measure--it is a measure of the probability of selling

goods at a specific price, time, and terms, based upon two variables: Desirability of the asset (reflected in demand) and the existence and depth of an established market for buyers and sellers of the asset type. By these standards, a minority interest in Johnco stock would lack marketability. A minority shareholder would have limited means of realizing economic gain, inasmuch as he could not compel distributions or liquidations and could not readily sell his interest to realize appreciation in the corporation's market value, because no established market exists for the sale of stock in closely held corporations.

In evaluating the marketability of a 98-percent stock interest in Johnco, it is not the desirability of the Johnco stock, or the existence of a market for such stock, that is the focus of our analysis. Because a 98-percent stock interest confers control, including the ability to liquidate the corporation, it is the desirability of Johnco's assets (principally the Timber Property) and the existence of a market for such assets that is most relevant in our analysis of marketability. Under Texas corporate law, a 98-percent controlling shareholder would have the authority to liquidate Johnco. As discussed supra, the Timber Property, which constituted 86 percent of Johnco's assets, was a highly desirable parcel of timberland located within a highly competitive timber market. During the early 1990's, the local market for timberland was considered to be very active, and properties of the size and quality of the Timber Property were in high demand. According to

Mr. Baker, there were a number of potential buyers for the Timber Property, including both timber products companies and pension funds, and he expected that it would sell within a few weeks after being placed on the market. A 98-percent shareholder in Johnco could also partially liquidate Johnco by selling timber or cutting rights, while retaining a fee in the land, inasmuch as a great portion of Johnco's fair market value was attributable to the value of the timber itself. Thus, Johnco, at least to the extent of its timberland, was marketable.

Not all of Johnco's nontimber assets were marketable, however. While cash and marketable securities certainly were marketable, Johnco's building and equipment were not, inasmuch as they were specialized assets that were not easily transported, and for which no established market existed. Finally, we think that the Harris County Real Estate owned by Johnco was marketable. That property's location within Tanglewood, a desirable residential area in suburban Houston, suggests that it could have been sold at its fair market value within a reasonable time, as one of petitioner's experts, Mr. Buck, confirmed.

Petitioner offers no expert opinion in support of a 10-percent discount for lack of marketability. Respondent's expert calculated that approximately 6 percent of Johnco's assets lacked marketability and therefore concluded that the ceiling on any discount for lack of marketability should be 6 percent. In reaching that figure, however, respondent's expert treated the Harris County Real Estate as lacking marketability, a conclusion

with which we disagree. Removing the Harris County Real Estate from the assets lacking marketability reduces their percentage of the total assets to approximately 3 percent. Relying on respondent's expert's analysis, as adjusted, we conclude that petitioner is entitled to a 3-percent discount for lack of marketability.

### 3. Nuisance Discount

This Court has never recognized the application of a nuisance discount as such in determining the fair market value of stock in a closely held corporation. Petitioner seeks a discount to reflect the nuisance that a 3-percent[28] shareholder would pose to a potential buyer of decedent's Johnco stock, contending that Andrew could use his position as president of Johnco to sabotage or impede a sale of decedent's Johnco stock.[29] We do not think Andrew was in such a position. Andrew may have been president, but Northern Trust, as executor of the Estate, controlled Johnco and could have fired Andrew if he interfered unreasonably with the sale of decedent's Johnco stock. We also think the risk of minority shareholder litigation on the valuation date is remote,

---

[28] In accordance with its position that shares constituting a 97-percent interest in Johnco were includable in decedent's estate, petitioner assumes that Andrew's unified credit bequest made him a 3-percent shareholder of Johnco. We elsewhere conclude that the correct percentages are 98 and 2, respectively.

[29] Petitioner also argues in this regard that Andrew could interfere with a potential buyer's due diligence. However, a hypothetical willing buyer is deemed to have reasonable knowledge of all relevant facts for purposes of defining the market value, and thus petitioner's contention is irrelevant.

insofar as a 97-percent, or 98-percent,[30] shareholder would have considerable discretion in its control of Johnco under Texas corporate law.  We acknowledge that the existence of a minority shareholder may pose an annoyance in comparison to ownership of a 100-percent stock interest but think that a hypothetical buyer would be willing to overlook this factor in light of the desirability of the Timber Property.  Accordingly, we agree with respondent that no nuisance discount is warranted.

4.  Selling Costs

We have rejected the conclusions of petitioner's experts that a hypothetical purchaser of decedent's Johnco stock would liquidate Johnco.  We agree with respondent that the application of any discount to reflect selling costs that a hypothetical purchaser might incur is unwarranted

5.  Effect of Settlement

We now turn to the question of what effect, if any, the settlement agreement between Andrew and Dinah should have in our determination of the fair market value of decedent's Johnco stock.  For Federal estate tax purposes, the fair market value of the subject property is determined as of the date of death of the decedent, or alternatively, on the alternate valuation date under section 2032; ordinarily, no consideration is given to any unforeseeable future event that may have affected the value of the subject property on some later date.  Sec. 2031; sec.

---

[30] See supra note 28.

20.2031-1(b), Estate Tax Regs.; see also First Natl. Bank v. United States, 763 F.2d 891, 893-894 (7th Cir. 1985); Estate of Newhouse v. Commissioner, 94 T.C. at 218; Estate of Gilford v. Commissioner, 88 T.C. at 52.

In this case, petitioner asks us to look at the price negotiated in a settlement consummated more than 2 years after the death of decedent as being determinative of the fair market value of decedent's Johnco stock on the valuation date. While we normally do not look to future events in determining fair market value, the amount set by a freely negotiated agreement made reasonably close to the valuation date may be relevant, but is not conclusive, as to fair market value. United States v. Simmons, 346 F.2d 213 (5th Cir. 1965); First Natl. Bank v. United States, supra; Estate of Spruill v. Commissioner, 88 T.C. 1197 (1987). Although the product of a freely negotiated and arm's-length agreement, in which both parties were represented by counsel, we are not persuaded that the $4,025,000 settlement amount accurately reflected the fair market value of decedent's Johnco stock on the valuation date. The settlement amount closely resembles the $4,200,000 amount recommended by Mr. Buck. We have found serious fault in his assumptions regarding the need to liquidate Johnco and have accordingly rejected his determination of fair market value. In arriving at a settlement amount of $4,025,000, we think it is likely that Andrew and Dinah also acted upon the erroneous assumption that Johnco was properly valued by assuming it would be liquidated. Thus, while we

believe the settlement was arm's length, we doubt its reliability as an accurate measure of the fair market value of decedent's Johnco stock on the valuation date.  Thus, we accord little weight to the settlement amount in determining the fair market value of decedent's Johnco stock.

C.   Valuation Conclusions

On the basis of the foregoing, we find that for purposes of computing the taxable estate of decedent, the fair market value of decedent's 81,641 shares of Johnco stock was $5,784,477 (approximately $71 per share) on the date of decedent's death, calculated as follows:

|  | Fair market value of stock interest | |
| --- | --- | --- |
|  | 100% | 98% |
| Johnco | $6,958,000 | $6,818,840 |
| Reduction for built-in capital gains | (872,920) | (855,462) |
| Difference | 6,085,080 | 5,963,378 |
| Less marketability discount | (182,552) | (178,901) |
| Fair market value | 5,902,528 | 5,784,477 |

Fair market value per share: $71

III. Constitutional Challenge

We now address petitioner's contention that a portion of the estate tax as applied is unconstitutional.  The Federal estate tax is imposed on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States.  Sec. 2001; United States Trust Co. v. Helvering, 307 U.S. 57, 60 (1939).  The taxable estate is defined as the decedent's gross

estate, less specified deductions.  Sec. 2051.  Federal estate taxes are not a permissible deduction from the gross estate.  The value of the gross estate generally includes the value of all property to the extent of the interest therein of the decedent at the time of his death.  Secs. 2031, 2033.

Petitioner "acknowledges the power of the federal government to impose an estate tax", but "challenges the application of the current estate tax to property which is not transferred, but which is instead required to be paid to the federal government in the form of estate taxes".  According to petitioner's argument, the constitutionality of the estate tax depends upon its status as an excise tax imposed upon the transfer of property at death.  Because the estate tax is calculated using the taxable estate as a base (i.e., with no deduction for estate tax paid), a portion of the tax collected by the Government is imposed on property that is not susceptible of transfer by the decedent but instead is required to be paid to the Government in the form of the estate tax.  This portion is thus, in petitioner's terms, "a tax on tax payment", and such treatment makes the computation of the estate tax "tax inclusive".  As a result, petitioner contends, the portion of the estate tax attributable to property that is paid to the Government in satisfaction of the estate tax is not a mere excise tax on the transfer of property at death but a direct tax on the value of the property itself, which is unconstitutional because it is not apportioned in accordance with Article I, Section 9, Clause 4 of the Constitution.

There are a number of problems with petitioner's theory. First, we believe petitioner overlooks both the long history of treating taxes occasioned by death as excise rather than direct taxes[31] and the fact that the Supreme Court's touchstone for determining a direct tax has been historical treatment, rather than logical analogy.  In New York Trust Co. v. Eisner, 256 U.S. 345 (1921), the Supreme Court brushed aside the taxpayer's effort to distinguish the estate tax there at issue from the inheritance tax sustained against a "direct tax" challenge in Knowlton v. Moore, 178 U.S. 41, 81 (1900).  The taxpayer in New York Trust Co. had sought to make a distinction, for "direct tax" purposes, between an inheritance tax and an estate tax, based upon the former's imposition on the privilege of receipt.  The Supreme Court, relying heavily on its earlier opinion in Knowlton v. Moore, supra, dismissed the effort, not because of "some scientific distinction", but based

> on the practical and historical ground that this kind of tax always has been regarded as the antithesis of a direct tax; "has ever been treated as a duty or excise, because of the particular occasion which gives rise to its levy." [Knowlton v. Moore] 178 U.S. 81-83 * * *  Upon this point a page of history is worth a volume of logic.  [New York Trust Co. v. Eisner, supra at 349.]

---

[31]  Knowlton v. Moore, 178 U.S. 41, 81 (1900); see, e.g., Bromley v. McCaughn, 280 U.S. 124, 137 (1929) ("[excise] taxes of this type were not understood to be direct taxes when the Constitution was adopted"); New York Trust Co. v. Eisner, 256 U.S. 345 (1921).

The estate tax regime at issue in New York Trust Co.[32] was "tax inclusive" in the same manner now faulted by petitioner in the current estate tax structure provided in sections 2001-2209. We think petitioner's effort to dissect the estate tax at issue herein into a constitutionally permissible portion (i.e., the tax imposed with respect to property transferred to heirs) and a constitutionally impermissible portion (i.e., the tax imposed with respect to property paid to the Government as tax, or the "tax on a tax payment") is the kind of "scientific distinction" long ago rejected in New York Trust Co., Knowlton v. Moore, supra, and Nicol v. Ames, 173 U.S. 509 (1899). Just as the differences in estate and inheritance taxes were deemed inconsequential for purposes of determining what constitutes a direct tax in New York Trust Co., we believe petitioner's distinctions likewise lack constitutional significance.

Second, both the inheritance tax upheld in Knowlton v. Moore, supra, and the estate tax upheld in New York Trust Co., against "direct tax" challenges were "tax inclusive" in the same manner as that with which petitioner finds fault in the current estate tax. Concededly, the "direct tax" attack in the prior cases was not framed in terms of the taxes' "tax inclusive" structure. We have found only one case where the "tax inclusive" feature of the estate tax was attacked on constitutional grounds. In Old Colony Trust Co. v. Malley, 19

_____

[32] Revenue Act of 1916, ch. 463, sec. 201, 39 Stat. 777.

F.2d 346 (1st Cir. 1927), an estate challenged an estate tax regulation that expressly disallowed the deduction of estate taxes from the determination of the net estate for purposes of computing estate tax liability, as unconstitutional and as inconsistent with the statute (Revenue Act of 1916, ch. 463, sec. 203, 39 Stat. 778, as amended).  The estate contended that the amount of estate tax imposed by the statute should not be included in the base used as a measure of the tax.  The Court of Appeals rejected the challenge, finding the regulation consistent with the meaning of the statute and the constitutional challenge "a claim so obviously unsound as to call for no discussion."  Old Colony Trust Co. v. Malley, supra at 347.

Third, petitioner's fundamental claim, and the fatal flaw in its argument, concerns the nature of the transfer required to insulate the estate tax from attack based on the "direct tax" strictures of the Constitution.  Petitioner sums up its argument as follows:

> Petitioner views the estate tax as a tax on the transfer of property at death, consistent with Knowlton v. Moore, 178 U.S. 41 (1900), and is concerned solely with the amount of property that a decedent can transfer at death.
>
> The problem with the estate tax as it is currently assessed is that a large portion of the tax is imposed on the decedent's property not because of its transfer at death but, rather, merely because of its ownership by the decedent, in clear violation of Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429, reh'g granted, 158 U.S. 601 (1895).  Specifically, the amount of a decedent's estate that must be paid as estate tax is not "transferred" at death to anyone.  Therefore, it cannot itself be taxed

under what is supposed to be an excise tax on the transfer of property at death.

In petitioner's view, then, the estate tax may constitutionally be imposed only with respect to property that is transferred to a person. We think petitioner confines the permissible scope of the tax far too narrowly in light of long-established Supreme Court interpretations. With reference to a predecessor estate tax (Revenue Act of 1918, ch. 18, sec. 401, 40 Stat. 1096), which provided for a computation of the taxable estate in the same "tax inclusive" fashion as the current tax, the Supreme Court observed: "What this law taxes is not the interest to which the legatees and devisees succeeded on death, but the interest which ceased by reason of death." Young Men's Christian Association v. Davis, 264 U.S. 47, 50 (1924). See also Ithaca Trust Co. v. United States, 279 U.S. 151, 155 (1929); Knowlton v. Moore, supra at 49. Instead, the estate tax extends more broadly as an excise upon the shifting at death of the incidents of property. As the Supreme Court clarified more than 50 years ago in Fernandez v. Wiener, 326 U.S. 340, 352 (1945):

> It is true that the estate tax as originally devised and constitutionally supported was a tax upon transfers. But the power of Congress to impose death taxes is not limited to the taxation of transfers at death. It extends to the creation, exercise, acquisition, or relinquishment of any power or legal privilege which is incident to the ownership of property, and when any of these is occasioned by death, it may as readily be the subject of the federal tax as the transfer of property at death. [Citations omitted.]

The taxpayer in Fernandez had challenged the imposition of the estate tax in that case on "direct tax" grounds not dissimilar to those advanced by petitioner. Fernandez involved a since-repealed provision (Revenue Act of 1942, ch. 619, sec. 402, 56 Stat. 941-42) that required the inclusion of the entire amount of community property (both the decedent's and the surviving spouse's shares, except for any portion traceable to the surviving spouse's personal earnings or separate property) in the taxable estate of the first-dying spouse. The taxpayer argued that insofar as the estate tax was imposed on the value of the surviving wife's share of community property, it was an unconstitutional (unapportioned) direct tax because there was no "transfer" of the wife's community share to her; she merely retained the share she owned prior to her husband's death. The Court, although conceding that the wife owned her share before and after her husband's death, concluded that the husband's death terminated a right to manage the wife's share accorded him under State law and made her control exclusive. This "redistribution of powers and restrictions on powers", even though ownership never changed "[furnishes] appropriate [occasion] for the imposition of an excise tax." Fernandez v. Wiener, supra at 355-356. "It is enough that death brings about changes in the legal and economic relationships to the property taxed". Id. at 356.

Under the very broad test of <u>Fernandez</u>, we think the estate tax imposed in the instant case is free of constitutional defect. There was a cessation of decedent's interests in the assets of her gross estate that was occasioned by death, both with respect to any property transferred to Andrew and Dinah and any property remitted to the Government in payment of the estate tax. Accordingly, the imposition of the estate tax in this case falls well within the taxing power previously sanctioned by the Supreme Court.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

| | | | | | | TIMBER GROWTH | | YEAR-END TIMBER CUTTING | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Beginning | Fair Market Value | | Adjusted | Purchased | Annual | Year-End | Units | Basis | Basis | Built-in Gains | Capital Gains |
| Year | Timber Units | Total | Per Unit | Basis | Built-in Gain | Growth | Timber Units | Cut | Per Unit | Allocated | Recognized | Tax |
| 1 | 100,000 | $6,000,000 | $60.00 | $217,850 | $5,782,150 | 10,000 | 110,000 | 10,000 | $1.98 | $19,805 | $580,195 | $197,266 |
| 2 | 100,000 | 6,240,000 | 62.40 | 198,045 | 5,201,955 | 10,000 | 110,000 | 10,000 | 1.80 | 18,004 | 605,996 | 206,039 |
| 3 | 100,000 | 6,489,600 | 64.90 | 180,041 | 4,595,959 | 10,000 | 110,000 | 10,000 | 1.64 | 16,367 | 632,593 | 215,081 |
| 4 | 100,000 | 6,749,184 | 67.49 | 163,674 | 3,963,366 | 10,000 | 110,000 | 10,000 | 1.49 | 14,879 | 660,039 | 224,413 |
| 5 | 100,000 | 7,019,151 | 70.19 | 148,794 | 3,303,327 | 10,000 | 110,000 | 10,000 | 1.35 | 13,527 | 688,388 | 234,052 |
| 6 | 100,000 | 7,299,917 | 73.00 | 135,268 | 2,614,939 | 10,000 | 110,000 | 10,000 | 1.23 | 12,297 | 717,695 | 244,016 |
| 7 | 100,000 | 7,591,914 | 75.92 | 122,971 | 1,897,244 | 10,000 | 110,000 | 10,000 | 1.12 | 11,179 | 748,012 | 254,324 |

| | |
|---|---|
| Inflation Rate | 4% |
| Timber Growth Rate | 10% |
| Capital Gains Tax Rate | 34% |
| Discount Rate | 20% |

| 8 | 100,000 | 7,895,591 | 78.96 | 111,791 | 1,149,232 | 10,000 | 110,000 | 10,000 | 1.02 | 10,163 | 779,396 | 264,995 |
| 9 | 100,000 | 8,211,414 | 82.11 | 101,629 | 369,836 | 10,000 | 110,000 | 4,555 | 0.92 | 4,209 | 369,835 | 125,744 |
| | | | | | | | | | | | $5,782,150 | $1,965,931 |
| | | | | | | | | | | | | |
| Note: numbers may reflect rounding | | | | | | | | | | Net Present Value (NPV) = | | ($872,920) |