T.C. Memo. 2000-264


UNITED STATES TAX COURT


ESTATE OF CHARLES A. BORGATELLO, DECEASED, C. NORMAN BORGATELLO
AND JOSEPHINE E. DONNELLY, CO-EXECUTORS, AND C. NORMAN BORGATELLO,
SUCCESSOR TRUSTEE TO THE CHARLES A. BORGATELLO LIVING TRUST,
Petitioners <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 24756-97.              Filed August 18, 2000.


<u>John W. Ambrecht</u> and <u>Gregory Arnold</u>, for petitioners.

<u>Donna F. Herbert</u>, for respondent.


MEMORANDUM OPINION


WELLS, <u>Chief Judge</u>:  Respondent determined a deficiency of

$3,424,504 in the Federal estate tax of the estate of Charles A.

Borgatello (the estate).  After concessions, the issues we must

decide involve the fair market value of stock representing an

82.76-percent interest in Valley Improvement Co., Inc. (VIC)[1] as of January 12, 1994.  To value the 82.76-percent shareholder's interest in VIC, we must first decide the fair market value of two shopping centers owned by VIC, Montecito Village North (MVN) and Montecito Village South (MVS), as of January 12, 1994.  The parties agreed on the value of VIC's other assets.  Some of the facts have been stipulated and are incorporated herein by this reference.  Unless otherwise noted, all section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Charles Borgatello died a resident of California.  Mr. Borgatello died on July 12, 1993.

Background

For the purpose of valuing Mr. Borgatello's assets, the estate's executors elected the alternate valuation date of January 12, 1994.  On the alternate valuation date, VIC owned 100 percent of MVN and MVS.  VIC also owned other assets with a total value (pursuant to the parties' stipulations) of $3,188,000 (rounded).[2]  Per the parties' stipulations, on the alternate

---

[1]    Valley Improvement Co. is a California C corporation.

[2]    The value of the other assets is as follows:

| Real Property | Fair Market Value |
| --- | --- |
| 550 Santa Angela Lane | $425,000 |
| Monterey county Ranch (remainder interest) | 325,000 |
| 15.8 acres of vacant land outside Solvang (50% interest) | 170,000 |
| | (continued...) |

valuation date, VIC had total liabilities of $2,543,000.  The net value of VIC's assets[3] on the alternate valuation date equaled the values of MVN and MVS, plus $645,000 (assets of $3,188,000 minus liabilities of $2,543,000).

---

(...continued)

| | |
|---|---|
| 1562 Alamo Pintado outside of Solvang | 475,000 |
| Seven Properties zoned M-1 in Santa Barbara | |
| 130 Nopalitos | 140,000 |
| 126 Nopalitos | 61,595 |
| 710 Kimball Street | 87,785 |
| 712 Kimball Street | 101,850 |
| 718 Kimball Street | 101,850 |
| 713 Carpinteria Street | 101,850 |
| 119 Powers Avenue | 91,180 |
| Total | $2,081,110 |

Tangible Personalty

| | |
|---|---|
| Equipment & cattle | $195,000 |
| Total | $195,000 |

| Investments | Fair Market Value |
|---|---|
| Chevron Corp. stock | $25,974 |
| Pepsico, Inc. stock | 154,319 |
| Transamerica Corp. stock | 79,463 |
| General Motors stock | 14,457 |
| General Motors E stock | 1,808 |
| General Motors H stock | 709 |
| Western art | 66,450 |
| Total | $343,180 |

| Other Assets | Fair Market Value |
|---|---|
| Cash | $72,000 |
| Accounts and notes receivable | 293,000 |
| Other current assets | 151,000 |
| Other assets | 52,000 |
| Total | $568,000* |

*The parties made a computational error in their stipulation.  This amount was reported as $516,000 in the stipulation, not $568,000.

[3]    According to the parties, net asset value is generally the difference between assets and liabilities, where assets have been adjusted to reflect fair market values and liabilities have been adjusted to reflect the reality of their ultimate payment.

Discussion

The estate contends that the combined value of MVN and MVS is $13,375,000 (MVN, $8,375,000 and MVS, $5,000,000). On the basis of those values and the stipulated value of VIC's other assets, the estate contends that Mr. Borgatello's 1,037 shares of VIC stock are worth $7,542,101. Respondent contends that the combined value of MVN and MVS is $15,799,000 (MVN, $9,925,000 and MVS, $5,874,000). On the basis of those values and the stipulated value of VIC's other assets, respondent contends that Mr. Borgatello's interest in VIC is worth $9,930,000.

Procedural Issue

Before we tackle the issues of the fair market values of MVN and MVS and Mr. Borgatello's interest in VIC, we must first address an evidentiary issue concerning certain appraisal reports prepared by the experts in this case. The estate commissioned several appraisals of MVN and MVS. One of the real estate appraisers, Wayne Holden, was asked to value MVN and MVS as of the date of Mr. Borgatello's death. For this purpose, Mr. Holden produced a set of appraisals that he completed on January 14, 1994 (Holden I reports). Subsequently, the estate asked Mr. Holden to appraise MVN and MVS as of the alternate valuation date. Mr. Holden updated his previous appraisals in two letters dated February 21, 1994 (Holden II reports). The Holden II

reports ostensibly adjusted Mr. Holden's conclusions regarding the shopping center values in the Holden I reports for changes in the real estate market during the 6 months between the date of Mr. Borgatello's death and the alternate valuation date. On the basis of the Holden II reports, the estate decided to elect the alternate valuation date.

During the audit of the instant case, the estate provided respondent with the Holden I and II reports. Later, during discussions with respondent's Appeals Office, the estate provided the Appeals officer with two reports by Carlos A. Cardenas (Cardenas reports) valuing MVN and MVS on the alternate valuation date. The Cardenas reports were not used in the preparation of the estate's tax return and were not provided to the Internal Revenue Service during the audit of the estate. At trial, the estate did not use the Holden I or II reports or the Cardenas reports. Instead, the estate used two new appraisals by Mr. Holden (Holden III reports), which valued MVN and MVS on the alternate valuation date.

Respondent's valuation of MVN and MVS is based upon two appraisal reports (in a single bound volume) prepared by David Marx. Mr. Marx prepared a Limited Summary report in which he reviewed the Holden I, II, and Cardenas reports and adopted some background data and conclusions from those reports. In

particular, Mr. Marx adopted background data pertaining to Montecito-Santa Barbara area vacancy rates and fair rental value. He also agreed with the estate's experts' analyses pertaining to highest and best use, zoning, site and improvement, and neighborhood description. The first two pages of each of Mr. Marx's reports contain cover letters dated March 7, 1999, from Mr. Marx to respondent's attorney. Both letters contain the following disclaimer:

> This Limited Summary Report is valid only if another reviewer or entity is in possession of the [Holden I, Holden II, and Cardenas appraisals] * * *. The appraiser agreed on some of the factual data and issues in these reports, and these items were used in this Limited Summary Report as part of the analysis of the subject. The three appraisals being reviewed, will be relied upon as to facts concerning the site, improvements, zoning and other descriptions. The appraiser will not complete a zoning analysis, site & improvement analysis or Highest and Best Use or neighborhood descriptions. These items are found in the appraisals reviewed by David Marx, and are assumed to be valid. [Emphasis in the original.]

At the trial of the instant case, the estate objected to the admission of Mr. Marx's reports, the Cardenas reports, and the Holden I and II reports. The Court admitted, over the estate's objection, the Holden I and II reports into evidence. The Court conditionally admitted Mr. Marx's reports, but reserved ruling on the admissibility of the Cardenas reports. The Court instructed

the parties to brief the admissibility of Mr. Marx's reports and the Cardenas reports.

The estate disputes the admissibility of Mr. Marx's reports on several grounds. Chiefly, however, the estate argues that the Cardenas reports are inadmissible hearsay pursuant to rule 802 of the Federal Rules of Evidence. Additionally, the estate argues that if the Cardenas reports were excluded, it would cause Mr. Marx's reports to become invalid in accordance with the above-quoted disclaimer. Respondent contends that the Cardenas reports are not hearsay because they constitute admissions by the estate.

Rule 801(d)(2)(B) of the Federal Rules of Evidence expressly provides that any statement offered against a party where that party has manifested an adoption or belief in the statement's truth is admissible. See Fed. R. Evid. 801(d)(2)(B). Statements admitted pursuant to rule 801(d)(2)(B) of the Federal Rules of Evidence are admissible only against parties who have adopted them or who bear a specified relationship to the declarant. See Hospital Corp. of Am. v. Commissioner, T.C. Memo. 1996-559. In the instant case, the Cardenas reports were given to respondent before trial by the estate's counsel. The reports were not obtained by respondent directly from the estate's experts. The estate supplied the reports to respondent as representations of the values (and the data underlying those values) of MVN and MVS.

The act of producing the reports to respondent constitutes an adoption of belief in the truth of their contents pursuant to rule 801(d)(2)(B) of the Federal Rules of Evidence. Consequently, we hold that the requirements of rule 801(d)(2)(B) of the Federal Rules of Evidence are satisfied and the Cardenas reports are admissible.[4]

The estate vaguely suggests that the Cardenas reports were provided to respondent during settlement negotiations and, therefore, are inadmissible pursuant to rule 408 of the Federal Rules of Evidence. Although respondent acknowledged at trial that there may be some question as to whether the Cardenas reports were provided to respondent during settlement negotiations, the estate failed to demonstrate that such was the case. Consequently, we hold that the estate has not shown that the Cardenas reports are inadmissible pursuant to rule 408 of the Federal Rules of Evidence.

The estate's other main argument against the admission of Mr. Marx's report is based upon our holding in Diego Investors IV

---

[4]   The Cardenas reports are admissible on other grounds as well. One significant distinction between expert and fact witnesses is that experts are permitted to rely on evidence outside the trial record. See H Group Holding, Inc. v. Commissioner, T.C. Memo. 1999-334. The evidence outside the record may be hearsay and need not be otherwise admissible, but it can be used by the expert to formulate an opinion. See Fed. R. Evid. 703.

v. Commissioner, T.C. Memo. 1989-630.  In Diego Investors IV, the Court refused to allow an expert selected and paid for by the Commissioner to testify as the taxpayers' witness.  The taxpayers in Diego Investors IV sought to call the Commissioner's expert to enhance their tactical position by using selected portions of a report pertaining to sales data while refuting the remainder of the expert's unfavorable conclusions.  Although Diego Investors IV is distinguishable from the instant case in numerous ways, one critical distinction is that in the instant case, respondent has gained no tactical advantage by adopting some of the information in the estate's expert's reports.

In the instant case, the estate provided the Holden I, II, and Cardenas reports to respondent as evidence of the values of MVN and MVS, as well as to provide the facts and data underlying those values.  The estate now seeks to exclude those reports because they believe that if they are successful, we shall conclude that Mr. Marx's reports are invalid based on the language in Mr. Marx's disclaimer.  However, it appears that the estate failed to appreciate that the use of expert testimony is within the sound discretion of the trial judge.  The test for admissibility of expert testimony is whether the testimony will aid the trier of fact to understand the evidence.  See Fed. R. Evid. 702; United States v. Amaral, 488 F.2d 1148, 1152 (9th Cir.

1973).  Under Rule 702 of the Federal Rules of Evidence, the trial judge is given broad discretion in his role as gatekeeper to decide what evidence is relevant, reliable, and helpful to the trier of fact.  See Desrosiers v. Flight Intl. of Fla., Inc., 156 F.3d 952, 961 (9th Cir. 1998).  In the instant case, the estate's experts' reports are being offered to aid the Court in understanding Mr. Marx's report.  They are not being offered to refute the unfavorable conclusions of the estate's experts, nor are they being offered for a matter of out-of-context conjecture or opinion which supports only one party's position, as was the case in Diego Investors IV.  Respondent gained no real tactical advantage in the instant case when Mr. Marx adopted information from the estate's experts' reports.  The use of such reports is tantamount to an informal stipulation which saves the Court time in deciding a case that could have been settled by the parties.  Indeed, such information should have been incorporated into a formal stipulation.  We hold that the Marx and Cardenas reports are admitted into evidence.

Fair Market Value of the MVS and MVN Shopping Centers

As is customary in valuation cases, the parties in the instant case rely primarily on expert opinion evidence to support their contrary valuation positions.  In such cases, we evaluate the opinions of experts in light of the demonstrated

qualifications of each expert and all other evidence in the record. See Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); Parker v. Commissioner, 86 T.C. 547, 561 (1986). We have broad discretion to evaluate "'the overall cogency of each expert's analysis.'" Sammons v. Commissioner, 838 F.2d 330, 334 (9th Cir. 1988) (quoting Ebben v. Commissioner, 783 F.2d 906, 909 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1983-200), affg. in part and revg. in part on another ground T.C. Memo. 1986-318.

Expert testimony sometimes aids the Court in determining values, and sometimes it does not. See, e.g., Estate of Halas v. Commissioner, 94 T.C. 570, 577 (1990); Laureys v. Commissioner, 92 T.C. 101, 129 (1989) (stating that expert testimony is not useful when the expert is merely an advocate for the position argued by one of the parties). We are not bound by the formulas and opinions proffered by an expert witness and shall accept or reject expert testimony in the exercise of sound judgment. See Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). Where necessary, we may reach a determination of value based on our own examination of the evidence in the record. See Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C.

Memo. 1974-285; Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998).  Where experts offer divergent estimates of fair market value, we decide what weight to give these estimates by examining the factors they used in arriving at their conclusions.  See Casey v. Commissioner, 38 T.C. 357, 381 (1962).

We have broad discretion in selecting valuation methods, see Estate of O'Connell v. Commissioner, 640 F.2d 249, 251 (9th Cir. 1981), affg. on this issue and revg. in part T.C. Memo. 1978-191, and the weight to be given the facts in reaching our conclusion because "finding market value is, after all, something for judgment, experience, and reason", Colonial Fabrics, Inc. v. Commissioner, 202 F.2d 105, 107 (2d Cir. 1953), affg. a Memorandum Opinion of this Court.  Moreover, while we may accept the opinion of an expert in its entirety, see Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any part of such opinion, or reject the opinion in its entirety, see Parker v. Commissioner, supra at 561.  Because valuation necessarily results in an approximation, the figure at which this Court arrives need not be one as to which there is specific testimony if it is within the range of values that may properly be arrived at from consideration of all the evidence.  See Estate of O'Connell v.

Commissioner, supra at 252; Silverman v. Commissioner, supra at 933.

Real estate valuation is a question of fact resolved on the basis of the entire record. See Ahmanson Found. v. United States, 674 F.2d 761, 769 (9th Cir. 1981); Estate of Fawcett v. Commissioner, 64 T.C. 889, 898 (1975). The trier of fact must weigh all relevant evidence to draw the appropriate inferences. See Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. National Grocery Co., supra at 294-295; Estate of Newhouse v. Commissioner, supra at 217. The standard for valuation is fair market value, which is defined as the price that a willing buyer would pay a willing seller, both persons having reasonable knowledge of all relevant facts and neither person being under a compulsion to buy or to sell. See sec. 20.2031- 1(b), Estate Tax Regs.; see also United States v. Cartwright, 411 U.S. 546, 551 (1973); Estate of Simplot v. Commissioner, 112 T.C. 130, 151 (1999). The standard is objective, using a purely hypothetical willing buyer and seller who are presumed to be dedicated to achieving maximum economic advantage in any transaction involving the property, see Estate of Simplot, supra at 152, which must be achieved in the context of market and economic conditions at the valuation date, see Estate of Newhouse v. Commissioner, supra at 218.

There are generally three kinds of valuation methods used to determine the fair market value of real property: (1) The comparable sales method, (2) the income method, and (3) the cost method. See Marine v. Commissioner, 92 T.C. 958, 983 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991). Variously using these methods, the appraisers in the instant case estimated the property values as follows:

Montecito Village North

| Appraisal Method | Holden | Marx |
|---|---|---|
| Income approach (Discounted cash-flow) | $8,375,000 | $9,925,000 |
| Sales comparison | 7,900,000 | 10,369,000 |
| Cost[1] | -- | -- |

Montecito Village South

| Appraisal Method | Holden | Marx |
|---|---|---|
| Income approach (Discounted cash-flow) | $5,000,000 | $5,874,000 |
| Sales comparison | 4,900,000 | 5,972,000 |
| Cost | 4,600,000 | -- |

[1]Mr. Holden performed a cost approach analysis for Montecito Village North, but only for the date of death, not the alternate valuation date. The date of death value was determined by Mr. Holden to be $10,225,000.

Although the parties used more than one method to value MVN and MVS, each expert relied most heavily on a version of the income method called the discounted cash-flow method. The sales comparison and the cost approach methods played insignificant roles in their analyses and appear to have little effect on Mr.

Holden's and Mr. Marx's bottom line valuations.[5]  The income method, on the other hand, is embraced by both Mr. Marx and Mr. Holden and dominates their analyses.  Because the parties' main focus is on the income method of valuing MVN and MVS, our focus, too, will be on the income valuation method.

---

[5]    With respect to the cost approach, the estate's expert said the following:

> The Cost Approach to value is an indicator for new or proposed improvements, however, older improvements, such as the subject are more difficult to analyze.  The most important factor in appraising older properties is the estimate of depreciation.  Although great care is taken in this analysis, it is difficult for the Appraiser to truly and accurately estimate the value losses by depreciation.  This is mainly due to the lack of full knowledge of the infrastructure of a building. You cannot see into the walls and many areas are inaccessible.  Therefore, it is difficult to determine the true condition of all building components.  This weakens the support for the depreciation estimate.  The typical purchaser does not generally use this approach to make an investment decision.  * * *  Also, there is a lack of * * * [comparable] land sales.  This makes the analysis for the land value weak.  Therefore, this approach is given least weight in support of the final estimate of value.

As for the sales comparison approach, we are concerned about the lack of suitable comparables in the Monecito-Santa Barbara area upon which to base any meaningful analysis.  Mr. Holden echoed this concern in his report, stating that "Due to the varying characteristics of the sales data, direct market comparison [as a method to value MVN and MVS] is weak."  Under the circumstances of the instant case, the sales comparison approach is unreliable. This unreliability is reflected in Mr. Holden's report where he abandons his cost approach and sales comparison analyses and adopts whole hog his conclusions from his discounted cash-flow analysis as the fair market value of MVN and MVS.

The parties in the instant case rely on a version of the income valuation method called the discounted cash-flow (DCF) method.  The DCF method is a set of procedures in which an appraiser specifies the quantity, variability, timing, and duration of periodic income, as well as the quantity and timing of reversions, and discounts each to its present value at a specified yield.  In formulating their DCF analyses, each expert in the instant case uses different input assumptions but their cash-flow estimates end up being very similar.[6]  The main reason

---

[6]     The cash-flow estimates of the experts are as follows:

|  | MVN | |
|  | Holden | Marx |
| --- | --- | --- |
| Year 1 | $849,228 | $812,778 |
| Year 2 | 866,213 | 845,042 |
| Year 3 | 883,537 | 876,840 |
| Year 4 | 901,208 | 887,042 |
| Year 5 | 946,268 | 923,371 |
| Year 6 | 993,582 | 941,771 |
| Year 7 | 1,043,261 | 948,896 |
| Year 8 | 1,095,424 | 1,007,989 |
| Year 9 | -- | 1,156,425 |
| Year 10 | -- | 1,171,932 |
| Year 11 | -- | 1,209,313 |

|  | MVS | |
|  | Holden | Marx |
| --- | --- | --- |
| Year 1 | $560,638 | $598,160 |
| Year 2 | 547,080 | 472,941 |
| Year 3 | 561,617 | 592,840 |
| Year 4 | 584,522 | 613,129 |
| Year 5 | 610,669 | 628,580 |
| Year 6 | 634,919 | 644,039 |
| Year 7 | 652,406 | 627,970 |

(continued...)

the parties arrive at different values for MVN and MVS is that their experts make different assumptions concerning the discount rate.[7]

Both Mr. Marx and Mr. Holden arrive at a discount rate by abstracting sales of comparable commercial properties in order to derive a capitalization rate. The capitalization rate is the property's cash-flow divided by its sales price. The discount rate is ascertained by making adjustments to the capitalization rate, primarily for inflation. Mr. Holden's capitalization rate was derived from a pool of comparable sales more extensive than Mr. Marx's capitalization rate. Most of Mr. Holden's comparables, however, are properties located in places outside the Montecito-Santa Barbara area, such as Oxnard and Los Angeles, California. Indeed, we find that aspect of Mr. Holden's analysis troubling. MVN and MVS are located in an area adjacent to the city of Santa Barbara. MVN and MVS are more than 90 miles away

---

(...continued)

| | | |
|---|---|---|
| Year 8 | 685,026 | 652,898 |
| Year 9 | -- | 686,984 |
| Year 10 | -- | 693,587 |
| Year 11 | -- | 707,083 |

[7] The discount rate is a rate of return on capital used to convert future payments, rental income, or receipts into a present value.

from Mr. Holden's comparables in Huntington Beach and Los Angeles, and more than 30 miles away from Oxnard.

Mr. Holden acknowledges that MVN and MVS are "situated in Santa Barbara's most desirable neighborhood".  He also notes that MVN and MVS "make up the majority of the commercial property in Montecito.  They almost set their own rental market." The Montecito-Santa Barbara community is unique in that there is very limited vacant land.  It is a small community, and there are not many shopping centers for sale at any given time, in contrast to Los Angeles and Orange counties where many shopping centers are for sale at any particular moment in time.  Moreover, during 1989, Santa Barbara voters passed "Measure E", which restricts the building of commercial and industrial properties in the city limits of Santa Barbara.  Mr. Holden states that, although it is too early to tell how Measure E would affect the real estate market in Santa Barbara, "more than likely, it will cause a shortage of commercial rental facilities and create high rents".  Accordingly, the unique character of the Montecito-Santa Barbara real estate market will be maintained well after the alternate valuation date.

Mr. Holden attempted to demonstrate the rising capitalization rates of commercial shopping center sales in

southern California.[8] However, because of the unique character of the Montecito-Santa Barbara area, we are primarily concerned only with how the softness in the real estate market was affecting capitalization rates in that area. Mr. Holden reported that sales in the Santa Barbara area during the time in question commanded capitalization rates of 9.17 percent and 9.4 percent. Mr. Marx researched three additional sales in Santa Barbara during 1993 and 1994 and found capitalization rates ranging from 7.83 percent to 9.4 percent. On the basis of such data, Mr. Marx concludes that an overall capitalization rate of 9.25 percent to 9.5 percent is appropriate in valuing MVN and MVS. He settles on 9.5 percent as the capitalization rate. Mr. Holden, on the other hand, went outside the Santa Barbara area in order to justify a higher capitalization rate for MVN and MVS. In his view, southern California was experiencing a soft real estate market at the time of the alternate valuation date. Mr. Holden fails to explain, however, why any market softness is not already reflected in the capitalization rates of the Montecito-Santa Barbara area comparables. We are inclined to keep the capitalization rate in the instant case within the range of

---

[8] In 1991, the average capitalization rate in southern California was 9.06 percent; in 1992 it was 9.59 percent; in 1993 it was 9.70 percent; in 1994 it was 10.66 percent; and in 1995 it was 10.26 percent.

capitalization rates found in the Montecito-Santa Barbara area at or near the time of the alternate valuation date. MVN and MVS are uniquely situated because of the lack of commercial rental property in the area. Mr. Holden fails to convince the Court that his use of widespread, southern California comparables is appropriate in analyzing MVN and MVS. We are persuaded, therefore, that a capitalization rate of 9.5 percent is in line with capitalization rates generally in the Montecito-Santa Barbara area at the alternate valuation date and is a reasonable estimation of the appropriate capitalization rate to use in valuing MVN and MVS.

As stated above, the discount rate is a derivative of the capitalization rate. Messrs. Holden and Marx agree that a 2-percent adjustment is needed to account for inflation. Mr. Marx makes a further adjustment that considers leasing and selling commissions along with absorption and tenant improvement issues, which reduces Mr. Marx's capitalization rate adjustment by approximately one-half of a percent. Mr. Holden makes no such adjustment. Given the range of estimated adjustments suggested by the experts, we find that 1.75 percent is a reasonable adjustment to the capitalization rate in order to arrive at the appropriate discount rate.

Another area of disagreement among the experts is the appropriate duration of the cash-flow period. Mr. Holden uses a 7-year cash-flow period whereas Mr. Marx uses a 10-year cash-flow period. Mr. Holden justifies his 7-year period on the basis of, inter alia, market uncertainties and the fact that as the cash-flow period is extended into the future, the analysis becomes less reliable. Mr. Holden also notes that real estate markets tend to flow in 7-year cycles. Mr. Marx points out that a 10-year cash-flow period is supported by information from local brokers and national real estate publications. Although 7 years may be a reasonable cash-flow period in some cases, we are inclined to follow the trends of the Montecito-Santa Barbara real estate market. We find, therefore, that Mr. Marx's estimate of a 10-year cash-flow period is persuasive because it follows more closely Santa Barbara's real estate norms.

On the basis of the foregoing discussion, we find Mr. Holden's valuation estimates to be too low and find Mr. Marx's estimates to be too high. We believe that $9,600,000 is a reasonable estimate of the value of MVN and $5,680,000 is a reasonable estimate of the value of MVS. With such values in mind, we now proceed to value Mr. Borgatello's interest in VIC.

Value of Mr. Borgatello's Interest in VIC

Knowing the value of MVS and MVN, we are now able to decide the price at which Mr. Borgatello's 82.76 percent stock interest in VIC "would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts." Sec. 20.2031-1(b), Estate Tax Regs. In the case of unlisted stock, such as the stock in question, the price at which sales of such stock are made in arm's-length transactions in an open market is the best evidence of value. See Estate of Davis v. Commissioner, 110 T.C. 530, 535 (1998). The record in the instant case does not contain any such sale of stock. Where the value of unlisted stock cannot be determined from actual sale prices, its value generally is to be determined by taking into consideration a host of factors, including, among others, the company's net worth, prospective earning power, and dividend-paying capacity. See, e.g., Estate of Davis, supra at 536.

When valuing a real estate holding company, however, the main emphasis is on the company's assets. See id. The net asset value method is the most reasonable one to use in a case such as the instant case, where the corporation functions as a holding, rather than an operating, company and earnings are relatively low in comparison to the fair market value of the underlying assets.

See, e.g., Estate of Davis v. Commissioner, supra; Estate of Piper v. Commissioner, 72 T.C. 1062, 1069-1070 (1979). The net asset value method involves arriving at the company's net asset value (the value of the company's assets less liabilites, where the assets have been adjusted to reflect their fair market value) and then discounting that value to account for various factors that affect its marketability. Principal factors affecting the discount in the instant case are the tax liability inherent in the built-in gain assets of VIC and the lack of marketability due to the difficulty of selling stock in a small closely held corporation such as VIC. We do not employ a fixed formula in considering the factors that we use to determine the fair market value of unlisted stock. See Estate of Davis, supra at 536. The weight to be given to the various factors in arriving at fair market value depends upon the facts of each case. See sec. 25.2512-2(f), Gift Tax Regs. We have broad discretion in assigning weight to the various factors and in selecting the method of valuation. See Estate of O'Connell v. Commissioner, 640 F.2d 249, 251-252 (9th Cir. 1981), affg. on this issue and revg. in part T.C. Memo. 1978-191; sec. 25.2512-2(f), Gift Tax Regs. The determination of the value of closely held stock is a matter of judgment rather than one of mathematics. See Estate of Davis, supra at 537. Moreover, because the valuation is

necessarily an approximation, it is not required that the value that we determine be one as to which there is specific testimony, provided that it is within the range of figures that properly may be deduced from the evidence. See id.

As in most valuation cases, the parties in the instant case rely extensively on the opinions of their respective experts to support their differing views about the fair market value on the valuation date. Each expert utilizes the net asset value method in order to value Mr. Borgatello's interest in VIC. For purposes of determining the appropriate discount to be applied to VIC's assets, the estate introduced the report of James Brockardt, who asserts that the net asset value of VIC should be discounted by 35 percent for lack of marketability. Respondent offered the report of Roger Wilde, who asserts that VIC's net asset value should be discounted by 27 percent for lack of marketability.

Mr. Wilde arrives at his discount using a build-up method. Mr. Wilde examines various factors and assigns a percentage value to each. Some factors increase and some decrease the net asset value discount. Wilde made the following adjustments to be included in the discount for lack of marketability:

| | | |
|---|---|---|
| 1. | Shareholder dividends and compensation paid | - 5% |
| 2. | Local economy and real estate market at 1/12/94 | + 5% |
| 3. | Management continuity | - 2% |
| 4. | Potential corporate gain and tax | + 19% |
| 5. | Restrictions on stock transfer | + 3% |
| 6. | Transaction and other costs | + 7% |

Mr. Brockardt, on the other hand, presents a general discussion of various factors, but does not assign a percentage value to any of them. He bases his total discount on his judgment and consideration of the factors as a whole. Thus, for example, Mr. Wilde reveals exactly how much of a discount he allows for the built-in gains in the assets of VIC, whereas with Mr. Brockhardt's report, we do not know how much of the discount was attributable to built-in gains. Mr. Wilde's build-up method presents a useful framework to consider the various factors at play in the instant case. Below, we consider those factors within his framework and in light of Mr. Brockardt's report.

Mr. Wilde reduces the discount by 5 percent because of VIC's "consistent and strong cash-flow (dividend payment capability) and low vacancy rate of the [VIC's] shopping centers." Mr. Wilde further states: "The Company's financial statements and dividend policy indicate that the company has paid nominal dividends, but does pay the controlling shareholder significant salary. This would be a favorable factor for an investor in the shares being valued."

Messrs. Marx and Holden accounted for the cash-flow provided by the properties and the economic conditions of the Santa Barbara area in their valuations of MVN and MVS. The estate argues that when arriving at a value for the corporation, we

should not consider factors that have already been taken into account in the valuation of VIC's assets.  We agree with the estate.

As pertains to cash-flow and dividend paying capacity, Section 5 of Rev. Rul. 59-60, 1959-1 C.B. 243, provides in pertinent part:

> (b) The value of the stock of a closely held investment or real estate holding company, whether or not family owned, is closely related to the value of the assets underlying the stock.  For companies of this type, the appraiser should determine the fair market values of the assets of the company.  Operating expenses of such a company and the cost of liquidating it, if any, merit consideration when appraising the relative values of the stock and the underlying assets.  <u>The market values of the underlying assets give due weight to potential earnings and dividends of the particular items of property underlying the stock</u>, capitalized at rates deemed proper by the investing public at the date of appraisal.  A current appraisal by the investing public should be superior to the retrospective opinion of an individual.  For these reasons, adjusted net worth should be accorded greater weight in valuing the stock of a closely held investment or real estate holding company, whether of not family owned, than any of the customary yardsticks of appraisal, such as earnings and dividend paying capacity.  [Emphasis added.]

The revenue ruling implies that potential earnings are already accounted for in the market value of MVN and MVS and should not be considered again in valuing the VIC stock.  As pertains to economic conditions and the softness in the real estate market, in <u>Estate of Berg v. Commissioner</u>, T.C. Memo. 1991-279, affd. in

part and revd. and remanded in part on another ground 976 F.2d

1163 (8th Cir. 1992), we stated:

> The values arrived at by * * * [the expert] were the basis for the date of death values of the corporate properties. * * * Because in appraising the properties * * * [the expert] took into account the market for such property, as well as general economic conditions in Grand Forks, the fair market value of Vaberg's corporate assets, and therefore the fair market value of 100 percent of the Vaberg stock, has already been adjusted for such conditions.

> To the extent that the market for residential real estate and general economic conditions would have a negative impact on the fair market value of the 26.92 percent of Vaberg stock held by the decedent, petitioner has already reduced the reported value of the stock on account of such impact. For this Court to adjust the discounts for minority interest and lack of marketability for these factors would be to duplicate the reduction in reported value due to such factors.

On the basis of our reasoning in Estate of Berg, supra, Mr.

Wilde's 5-percent increase in the net asset value discount

attributable to the general economic conditions of the Santa

Barbara area is inappropriate. Similarly, the 5-percent decrease

in the net asset value discount attributable to Mr. Wilde's

consideration of VIC's cash-flow and ability to pay dividends is

inappropriate pursuant to the reasoning of Rev. Rul. 59-60, 1959

C.B. 243, which is consistent with our conclusion in the instant

case. The estate additionally contends that Mr. Wilde's

adjustment for "Management Continuity" is already reflected in

the value of MVN and MVS. We do not agree.

It is not evident that Mr. Wilde's "Management Continuity" factor is reflected in the value of MVN and MVS or VIC's other assets.  The estate incorrectly equates Mr. Wilde's discussion of management continuity with the management costs associated with overseeing MVN and MVS.  Such management costs are indeed reflected in the value of MVN and MVS.  What we believe Mr. Wilde refers to in his brief discussion of management continuity is that managing VIC's real estate does not require the expertise needed to oversee a management intensive operating company with many employees.  Because VIC is a real estate holding company that maintains low vacancy rates in its properties (1 percent of total square footage vacant in a sluggish market), Mr. Wilde concludes that "The likelihood of a buyer being able to successfully manage the real estate holdings is strong."  Indeed, it seems likely that any buyer of VIC will choose not to employ VIC's current managers to oversee the company's properties. Continuity of the current VIC management is unnecessary for the company to succeed as a going concern.  The question then becomes whether Mr. Wilde's management continuity factor affects the discount in the manner he suggests.  We tend to think it does not.  Mr. Wilde reduces the net asset value discount by 2 percent for the management continuity factor, but we think the factor is neutral.  Consequently, we do not assign any weight to it.

We shall assign weight to the consideration of the built-in capital gain tax inherent in VIC's assets. We may allow the application of a built-in capital gains tax discount if we believe that a hypothetical buyer would have taken into account the tax consequences of the built-in capital gains when arriving at the amount he would be willing to pay for Mr. Borgatello's VIC stock. See Estate of Davis v. Commissioner, 110 T.C. at 550-554; Estate of Jameson v. Commissioner, T.C. Memo. 1999-43. Both parties agree in the instant case that a willing buyer would consider those tax consequences, but they disagree on how much to discount the net asset value to account for this factor.

The largest portion of Mr. Wilde's net asset value discount is attributable to the built-in gains inherent in VIC's assets. In calculating the discount attributable to the tax on the built-in gains, Mr. Wilde utilizes a 10-year holding period for the assets. Assuming a 2-percent growth rate, Mr. Wilde estimates the value of VIC's assets to be $22,214,089 for the year 2004. On the basis of such estimated value, Mr. Wilde calculates the built-in gain and applies California's 9.3 percent capital gains rate and a 34-percent Federal income tax rate to arrive at a future tax in 2004 in the amount of $7,500,008. Applying a discount rate of 8.3 percent (Long Term AFR + 2 percent for added risk), Mr. Wilde determines the present value of the future tax

to be $3,378,914. In order to arrive at the discount attributable to the future tax, Mr. Wilde divided $3,378,914 (the present value of the future tax) by $18,223,290 (the total value of VIC's real estate and investments) to arrive at a 19-percent (rounded from 18.5 percent) discount. Accordingly, Mr. Wilde's discount is not calculated as a percentage of net asset value; rather, it is calculated as a percentage of the value of VIC's real estate and investment property. Mr. Wilde errs in calculating the discount attributable to the tax on the built-in gain this manner.

Mr. Wilde errs in that the present value of the future tax should have been stated as a percentage of net asset value, not as a percentage of only VIC's real estate and investments. The estate correctly points out that the figure that Mr. Wilde arrives at "is irrelevant for purposes of calculating the percentage amount by which the taxes reduce the net asset value, because it excludes some assets and all liabilities." As a percentage of net asset value, the discount amount would not be 19 percent. The present value of the future tax, $3,378,914, divided by Mr. Wilde's net asset value, $16,443,000 produces a 20.5-percent discount. Accordingly, after correcting that error, the discount attributable to the tax on the built-in gains

inherent in VIC's assets would be 20.5 percent, not 18.5 percent rounded to 19 percent.

Mr. Brockardt does not engage in the kind of explicit analysis in which Mr. Wilde engages, but Mr. Brockardt does calculate, on the basis of Mr. Holden's valuations of MVN and MVS, the impact of an immediate tax on the net asset value of VIC. According to Mr. Brockardt, an immediate tax on the built-in gains would warrant a 31.2-percent discount in the net asset value of VIC. On the basis of our valuations of MVN and MVS, an immediate tax on the built-in gain would warrant a 32.3-percent discount in the net asset value of VIC.[9] Applying that amount as a discount to the net asset value is unrealistic because it does not account for any holding period for the assets. The estate's expert concedes that there would be some period of tax deferral although he did not articulate how long the period of deferral would be. Mr. Wilde assumes a 10-year holding period

---

[9]     We arrived at this amount as follows:

| | | |
|---|---:|---:|
| Net asset value | | $15,924,290 |
| Total assets at market value | $18,467,290 | |
| Less book value | (5,649,963) | |
| Unrealized capital gain | $12,817,327 | |
| Net California gain | $12,817,327 | |
| Less: California tax at 9.3% | (1,192,011) | |
| Net Federal gain | $11,625,316 | |
| Less: Federal tax at 34% | (3,952,607) | |
| Total Tax on capital gain | | $5,144,618 |
| TOTAL CAPITAL GAIN AS A PERCENTAGE OF NET ASSET VALUE: | | 32.3% |

for the assets.  Adjusting Mr. Wilde's figures for our lower

valuation of the shopping centers does not yield a different

percentage value.[10]

The range of discount values attributable to the tax on the

built-in gain in VIC's assets presented by the experts is 32.3

percent (if the assets are immediately liquidated) to 20.5

percent (if the assets are held for 10 years).  Although there is

no evidence that a willing buyer of VIC would immediately

liquidate the assets, there is also not much support for

respondent's contention that a buyer would wait 10 years before

liquidating the assets.  In reaching a middle ground, therefore,

we find it reasonable to discount the net asset value by 24

_____

[10]    The current fair market value of the built-in gain assets is
$17,704,290 ($17,361,110 (real estate) plus (investments in stock
and art) $343,180).  Such amount, assuming a 2-percent annual
growth rate for the 10-year holding period, would be worth
$21,581,354 on Jan. 12, 2004.  After adjusting for annual
depreciation of $156,000 per year during the 10-year holding
period (adding $1,560,000 to the projected built in gain), the
total projected built-in gain on Jan. 12, 2004, is $18,052,828.
The California tax on that amount, at 9.3 percent is $1,678,913.
Total Federal gain is $16,373,915 and, taxed at the 34-percent
corporate Federal rate, produces $5,567,131 in Federal tax.  The
total amount of Federal and California taxes on the projected
built-in gain is $7,246,044.  Assuming, as Mr. Wilde did, a
discount rate of 8.3 percent (Long term AFR + 2 percent for added
risk), the present value of the future $7,246,044 in taxes is
$3,264,571.  This amount, as a percentage of net asset value, is
20.5 percent ($3,264,571 divided by $15,924,290).

percent to account for the tax liability inherent in VIC's assets.

One of petitioner's main contentions for discounting the VIC stock is the presence of a stock purchase agreement. Although we believe that such agreement would have some chilling effect on a hypothetical sale, we do not agree that it would have the effect that the estate contends it would have. The agreement provides that before Mr. Borgatello or his estate sells his VIC shares, he must first offer his shares to the other VIC shareholders on pro rata basis at the price offered to the outside buyer. The other shareholders have 15 days to exercise their right of first refusal, and they may purchase any amount of the shares offered. After that 15-day period expires, VIC has the option of buying as many shares as it desires. After the consecutive 15-day periods expire, Mr. Borgatello could then sell the remaining shares to the third-party buyer.

The estate contends that the stock purchase agreement will inevitably lead to Mr. Borgatello's 82.76 percent block being sold in two smaller blocks because the minority shareholders will purchase just enough of the shares to gain control of VIC, leaving the third-party buyer with a minority interest. The estate, however, does not offer any evidence to prove that any of the VIC minority shareholders possess the means or the

inclination to purchase enough of the stock to force Mr. Borgatello's 82.76 percent block to be sold in two smaller blocks. More importantly, our analysis presumes that the transaction involves a willing buyer and a willing seller under no particular compulsion to enter into a transaction. We seriously doubt that a willing seller under no compulsion to sell would dispose of an 82.76-percent block of stock in the manner suggested by the estate. What is more likely is that the buyer and seller would seek assurances from the other shareholders that they would not interfere in the transaction by exercising their rights pursuant to the stock purchase agreement. This would add some uncertainty and a chilling effect to the transaction, but not to the extent that the estate argues. Consequently, we accept respondent's assessment of the stock purchase agreement and discount the net asset value by 3 percent for that factor.

The final adjustment Mr. Wilde makes to the net asset value accounts for transaction costs associated with the eventual sale of the assets. Mr. Wilde's estimation of these transaction costs is 7 percent of the net asset value. In an immediate liquidation, Mr. Brockardt estimates these costs to be 5.7 percent of the net asset value. Given the narrow range of these figures, we think a 6-percent discount for transaction costs is a reasonable estimate.

In sum, a total discount of 33 percent accounts properly for the lack of marketability of the VIC stock.  Discounting the net asset value by 33 percent leads to a valuation adjustment of $5,255,016.  On the basis of the foregoing examination of the record we conclude that the fair market value of Mr. Borgatello's VIC shares is as follows:

| | |
|---|---|
| Net asset value | $15,924,290 |
| Less: Valuation adjustment | 5,255,016 |
| Aggregate fair market value | $10,669,274 |
| Fair market value per share (1253 shares outstanding) | $8,515 |
| Fair market value of 1037 shares | $8,830,038 |

To reflect the foregoing,

Decision will be entered

pursuant to Rule 155.